# 24-825-cv

## United States Court of Appeals

*for the*

## Second Circuit

RONALD KETCHAM,

*Plaintiff-Appellant,*

- v. -

CITY OF MOUNT VERNON, MICHAEL HUTCHINS, and ALLEN PATTERSON,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX
FOR PLAINTIFF-APPELLANT RONALD KETCHAM**

David B. Shanies
Tristan M. Ellis
DAVID B. SHANIES LAW OFFICE
*Attorneys for Plaintiff-Appellant*
110 W. 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710

# **TABLE OF CONTENTS**

Preliminary Statement ............................................. 1

Jurisdictional Statement........................................... 1

Issues Presented for Review ....................................... 1

Statement of the Case ............................................. 3

Statement of Facts................................................. 4

Procedural History ................................................ 7

Summary of the Argument............................................ 9

Legal Standard .................................................... 12

Argument .......................................................... 13

Point I:  All of the Force Defendant-Appellee Patterson Used Was
     Excessive ................................................. 14

  I.    The District Court Misapplied the Third *Graham* Factor Because
      Patterson and Hutchins Failed to Identify Themselves as Police
      Officers, So No Reasonable Officer Could Have Believed That Mr.
      Ketcham Was Resisting Arrest................................... 14

  II.   Patterson and Hutchins Should Have Conducted, At Most, a *Terry*
      Investigatory Stop Before Forcibly Arresting Mr. Ketcham...................... 23

Point II:  The District Court Erred by Requiring Mr. Ketcham to Prove
     "Serious Physical Injuries" to Which He Alerted the
     Individual Defendants ................................... 33

  I.    Mr. Ketcham Was Not Required to Prove Serious Physical Injuries........ 33

  II.   The District Court Erred By Relying on the Fact That the
      Individual Defendants Removed Mr. Ketcham's Handcuffs Shortly
      After He Complained About Them Because Patterson's
      Application of Handcuffs Itself Was Plainly Unreasonable Under
      the Circumstances ......................................... 36

Point III:  Because the District Court Erred By Finding That
     Patterson's Use of Force Was Reasonable, Its Analysis of
     Mr. Ketcham's Failure to Intervene Claim Against Hutchins
     Was Also Erroneous ..................................... 39

Conclusion ........................................................ 41

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Atkins v. New York City*, 143 F.3d 100 (2d Cir. 1998) ............................................ 34

*Atkinson v. City of Mount View*, 709 F.3d 1201 (8th Cir. 2013) ...................... 17, 23

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ............................................................ 26

*Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015) ........................................ 14

*Clayborne v. Brown*, No. 20-cv-3145, 2023 WL 2581296,
    2023 U.S. Dist. LEXIS 46312 (C.D. Ill. March 20, 2023) ................................ 29

*Cugini v. City of New York*, 941 F.3d 604 (2d Cir. 2019) ............................... passim

*Dunaway v. New York*, 442 U.S. 200 (1979) ......................................................... 25

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) ............................................... 40, 41

*Gonzalez v. City of New York*, 69 F. App'x 7
    (2d Cir. 2003) (summary order) ......................................................................... 30

*Graham v. Connor*, 490 U.S. 386 (1989) ...................................................... passim

*Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006) ........................................ 35

*Henry v. United States*, 361 U.S. 98 (1959) ......................................................... 27

*Hill v. California*, 401 U.S. 797 (1971) ................................................................ 30

*Jackson v. City of New York*, 939 F. Supp. 2d 235 (E.D.N.Y. 2013) ..................... 35

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020) ..................................................... 34

*Ketcham v. City of Mount Vernon*, 992 F.3d 144 (2d Cir. 2021) ............. 7, 11, 33, 34

*Ketcham v. City of Mount Vernon*, No. 17-CV-7140 (AEK),
    2023 WL 2734483, 2023 U.S. Dist. LEXIS 57079 (S.D.N.Y. Mar. 31, 2023) ..... 8

*Krist v. Kolombos Rest., Inc.*, 688 F.3d 89 (2d Cir. 2012) ..................................... 12

*Lennox v. Miller,* 968 F.3d 150 (2d Cir. 2020) ...................................................... 40

*Lowth v. Town of* Cheektowaga, 82 F.3d 563 (2d Cir. 1996) ........................... 16, 17

*Mallory v. United States*, 354 U.S. 449 (1957) ..................................................... 27

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010) ....................... 27, 29

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ............................................. 19–20

*McKinley v. Crevatas*, No. 20 Civ. 3606 (KPF), 2023 WL 4364182,
    2023 U.S. Dist. LEXIS 115544 (S.D.N.Y. July 6, 2023) .............................. 18–19

*McLaurin v. Falcone*, No. 04-4849-cv, 2007 U.S. App. LEXIS 1839
(2d Cir. Jan. 25, 2007) (summary order) ............................................ 35

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................................... 18

*Negron v. City of New York*, 976 F. Supp. 2d 360 (E.D.N.Y. 2013) ....................... 24

*New Phone Co. v. City of New York*, 498 F.3d 127 (2d Cir. 2007) ........................... 9

*Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006) ............................................... 25, 32

*Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*,
310 F.3d 43 (2d Cir. 2002) ................................................................. 36

*People v. Hutchinson*, 971 N.Y.S.2d 73,
2013 N.Y. Misc. LEXIS 1383 (App. Div. 2d Dep't 2013) .......................... 16

*People v. Sajimi*, 872 N.Y.S.2d 692,
2008 N.Y. Misc. LEXIS 4688 (N.Y. Cty. Crim. Ct. July 21, 2008) ................ 18

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ............................................................. 24

*Robison v. Via*, 821 F.2d 913 (2d Cir. 1987) .......................................................... 33

*Rogoz v. City of Hartford*, 796 F.3d 236 (2d Cir. 2015) ..................................... 16, 38

*Singleton v. City of Newburgh*, 1 F. Supp. 2d 306 (S.D.N.Y. 1998) ................ 24–25

*Smith v. Barry*, 502 U.S. 244 (1992) ...................................................................... 9

*Stephenson v. Doe*, 332 F.3d 68 (2d Cir. 2003) ..................................................... 14

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................... 2, 10, 13

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) .................................... 12

*Tobing v. City of New York*, 929 F. Supp. 86 (E.D.N.Y. 1996) .............................. 24

*United States v. Davis*, No. 06-CR-272-1, 2007 WL 2728969,
2007 U.S. Dist. LEXIS 69214 (E.D. Pa. Sept. 19, 2007) ......................... 30

*United States v. De Leon*, 561 F.2d 421 (2d Cir. 1977) (per curiam) ................... 31

*United States v. Heliczer*, 373 F.2d 241 (2d Cir. 1967) ..................................... 20, 23

*United States v. Hensley*, 469 U.S. 221 (1985) ...................................................... 25

*United States v. Manley*, 632 F.2d 978 (2d Cir. 1980) .......................................... 31

*United States v. Pabon*, 871 F.3d 164 (2d Cir. 2017) ............................................ 26

*United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) ..................................... 24

*United States v. Reyes*, 353 F.3d 148 (2d Cir. 2003) ............................................. 12

iii

*United States v. Valez*, 796 F.2d 24 (2d Cir. 1986)..................................................31

*United States v. Walker*, 965 F.3d 180 (2d Cir. 2020)............................................29

*United States v. Zamarripa*, No. CR-10-2025-FVS, 2010 WL 3021862,
2010 U.S. Dist. LEXIS 76535 (E.D. Wash. July 29, 2010).........................29–30

*Victoria Cruises, Inc. v. Yangtze Cruises, Inc.*, 630 F. Supp. 2d 255
(E.D.N.Y. 2008)....................................................................................................27

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ........................................................32

*Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375 (S.D.N.Y. 2009) .........27

**Rules**

Fed. R. App. P. 4 .......................................................................................................8

**Statutes**

28 U.S.C. § 1291........................................................................................................1

28 U.S.C. § 1331........................................................................................................1

28 U.S.C. § 1343........................................................................................................1

28 U.S.C. § 1367........................................................................................................1

28 U.S.C. § 636..........................................................................................................1

42 U.S.C. § 1983........................................................................................................3

**Other Authorities**

United States Census Bureau, "New Rochelle City, New York,"
*https://www.census.gov/quickfacts/newrochellecitynewyork*
(last accessed July 12, 2024) ...........................................................................27

## PRELIMINARY STATEMENT

Plaintiff-Appellant Ronald Ketcham ("Mr. Ketcham" or "Plaintiff-Appellant") appeals from the March 31, 2023, Opinion and Order (the "Decision") (SPA-1–26)[1] of the Honorable Andrew E. Krause, United States Magistrate Judge, United States District Court for the Southern District of New York (the "District Court"), ruling for Defendants-Appellees the City of Mount Vernon, Michael Hutchins, and Allen Patterson ("Defendants-Appellees") after a bench trial and directing entry of judgment (the "Judgment") (SPA-27) against Plaintiff-Appellant and in favor of Defendants-Appellees.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §§ 636(c)(3) and 1291. The District Court had jurisdiction under 28 U.S.C. §§ 636(c)(1), 1331, 1343, and 1367.

## ISSUES PRESENTED FOR REVIEW

1.  Whether a police officer can justify using physical force against a citizen under the third *Graham* factor—"resisting arrest or attempting to evade arrest by flight," *see Graham v. Connor*, 490 U.S. 386, 396 (1989)— where the police officer does not identify himself as a police officer.

---

1. All citations to "SPA-XX" are to the Special Appendix; all citations styled "A-XX" are to the Joint Appendix.

1

2. Whether the District Court erred by finding that the Defendant-Appellee police officers' use of force while arresting Plaintiff-Appellant—an innocent civilian whom police had mistaken for someone else and to whom the officers did *not* identify themselves as police—was reasonable based on the District Court's finding that Mr. Ketcham "resisted arrested" by adopting "a defensive physical posture" and giving "challenging responses" to one of the unidentified officer's questions and statements, thus misapplying the third *Graham* factor. (SPA-20.)

3. Whether the District Court erred by concluding that the Defendant-Appellee police officers acted lawfully by arresting Mr. Ketcham on the sole basis that he "resembled" a person for whom the officers had a misdemeanor warrant, without first conducting a non-custodial investigative inquiry or "*Terry*" stop to confirm or dispel their suspicion that Mr. Ketcham was the person the officers were seeking. *See Terry v. Ohio*, 392 U.S. 1 (1968).

4. Whether the District Court erred by requiring Mr. Ketcham to prove "by a preponderance of the evidence that he sustained . . . serious physical injuries" to establish an excessive force claim. (SPA-23.)

5. Whether the District Court erred by finding Defendant-Appellee Hutchins not liable for failing to intervene to prevent the excessive force.

## <u>STATEMENT OF THE CASE</u>

This is a civil rights action brought under 42 U.S.C. § 1983 and state law.  The central question presented is whether a police officer can justify using injurious physical force by claiming a citizen "resisted arrest," where that officer failed to identify himself as a police officer and the citizen did not know it was a police officer using force against him.  The District Court answered that question in the affirmative; Mr. Ketcham asks this Court to answer it in the negative.

The case arises from Defendant-Appellee Allen Patterson's use of force against Mr. Ketcham on March 28, 2017.  That day, Patterson, a City of Mount Vernon Police Officer, and his partner, Defendant-Appellee Michael Hutchins (together, the "Individual Defendants"), were traveling without uniforms in an unmarked police car, when they saw Mr. Ketcham and mistook him for a person with a misdemeanor arrest warrant.  The officers pulled over and exited the unmarked car.  Without identifying himself as a police officer, Patterson advanced on Mr. Ketcham, grabbed him, forcibly arrested him, applied excessively tight handcuffs, and thereby injured Mr. Ketcham, while Hutchins failed to intervene.  Mr. Ketcham filed suit and ultimately proceeded to a bench trial.  The District Court ruled against Mr. Ketcham, concluding that he "resisted arrest," despite its factual finding that Mr. Ketcham "did not understand that Patterson and Hutchins

3

were police officers" because Patterson failed to "identify[] himself" as such. (SPA-14, 20–21.)

## **STATEMENT OF FACTS**[2]

On March 28, 2017, at approximately 4:30 p.m., Mr. Ketcham, then a 69-year-old retired United States probation officer, was walking to a nearby market. (SPA-2; A-49 (Trial Tr. 10).) As he walked along Main Street, New Rochelle, New York, that afternoon, Mr. Ketcham "had no reason to be concerned about an interaction with law enforcement," having "no outstanding warrants for his arrest, and indeed [having] had a long service record as a law enforcement officer himself." (SPA-2, 14.)

Then, without warning, the Individual Defendants approached Mr. Ketcham, leaving their unmarked police car, wearing plainclothes, and failing to announce themselves as police officers. (*Id.* at 3, 8, 13–14.) Patterson asked Mr. Ketcham, "[W]ho are you?" and told him, "I'm taking you in." (*Id.* at 15.) Mr. Ketcham, not realizing that the men were police officers, responded by asking, "[W]ho are you?" and, "[F]or what?" (*Id.* at 14–15.) At the start of the encounter, Mr. Ketcham bent his knees or took one step backwards—actions that Patterson

---

2. The following statement of facts are drawn from the District Court's Findings of Fact, which Mr. Ketcham does not challenge on appeal. (*See* SPA-2–18.)

and Hutchins took "as the assumption of a fighting stance, even though Plaintiff had not raised his arms or balled his hands into fists." (*Id.* at 15.)

Patterson and Hutchins had been patrolling the area for a man named Dominic Uzillia, for whom they had a misdemeanor arrest warrant. (*Id.* at 2–3.) They had driven from Mount Vernon, where they were assigned to the City of Mount Vernon Police Department's Warrant Squad, to New Rochelle, in an unmarked police car to search for Uzillia. (*Id.* at 2–3.) When Patterson and Hutchins saw Mr. Ketcham, they mistook him for Uzillia. (*Id.* at 3, 12.)

As the encounter quickly progressed, Patterson pushed Mr. Ketcham against a fence, pulled Mr. Ketcham's arm behind his back, and applied handcuffs as Mr. Ketcham "twist[ed] his body" or "sway[ed] his torso" and "scream[ed] at the top of his lungs, yelling for people on the street to call 9-1-1." (*Id.* at 8–9 & n.6, 14, 16.). Indeed, because the Individual Defendants had failed to identify themselves as police officers, Mr. Ketcham had "an ongoing sense that he was being abducted and/or robbed" and yelled so loudly "that his voice became hoarse." (*Id.* at 14, 16.) Throughout the encounter, Mr. Ketcham was "concerned for his safety and well-being." (*Id.* at 16.)

After hastily putting Mr. Ketcham in handcuffs, Patterson forced Mr. Ketcham into the Individual Defendants' unmarked police car as Mr. Ketcham "pushed his leg against the car, perhaps even without realizing it," because he "still

thought that he was in the process of being abducted." (*Id.* at 17.) While forcing Mr. Ketcham into the officers' car, Patterson inadvertently hit Mr. Ketcham's head into the car's metal frame. (*Id.*) It was only once the three men were in the car, as the officers spoke to each other, that Mr. Ketcham realized that Patterson and Hutchins were police officers who were trying to execute an arrest warrant. (*Id.*) Mr. Ketcham told the two officers that he was not the man for whom they were looking. (*Id.*) Within two to three minutes, Patterson removed Mr. Ketcham's identification from his pocket and confirmed that Mr. Ketcham was not, in fact, Uzillia. (*Id.* at 17–18.)

While in the car, Mr. Ketcham complained about the tightness of his handcuffs, which one of the officers removed "very shortly after he complained about them." (*Id.* at 18.) The handcuffing caused "broken skin and bruising on [Mr. Ketcham's] wrists"; "the bruising on his wrists remained painful for several days." (*Id.* at 23; A-465–69 (Pl.'s Trial Ex. 1).) One reason the handcuffs were tight was because Patterson failed to "double lock" them in his haste to apply them, which the Individual Defendants were trained to do, and which would have prevented the handcuffs from continuing to tighten to the point of causing Mr. Ketcham's visible physical injuries. (*See* SPA-12.)

6

## PROCEDURAL HISTORY

Mr. Ketcham filed suit on September 19, 2017. (A-3 (ECF No. 1).) On November 30, 2017, Mr. Ketcham filed an Amended Complaint, which Defendants-Appellees answered the same day. (*Id.* at 5 (ECF Nos. 16, 19); *id.* at 14–39 (Amended Complaint and Answer).)

On May 13, 2019, Defendants-Appellees filed a motion for summary judgment. (*Id.* at 7 (ECF No. 43).) The District Court granted the motion and ordered the clerk of the court to enter judgment for Defendants-Appellees on December 30, 2019. (*Id.* at 8 (ECF Nos. 50–51).) Mr. Ketcham filed a timely notice of appeal on January 3, 2020. (*Id.* (ECF No. 52).) This Court subsequently vacated the District Court's grant of summary judgment, remanding for a trial on the merits. *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 152–53 (2d Cir. 2021).

Following the remand, amidst the Covid-19 pandemic and the strain it imposed on the federal courts' trial dockets, the parties consented to the jurisdiction of the assigned magistrate judge and to a bench trial. (A-9 (ECF Nos. 59–60).) The District Court held a three-day bench trial on November 1, 2, and 4, 2021. (A-11 (Minute Entries dated November 1, 2, and 4, 2021).) Nearly a year-and-a-half later and after declining post-trial briefing, on March 31, 2023, the District Court issued the Decision from which Mr. Ketcham appeals, finding for Defendants-Appellees and directing the clerk of the court to enter the Judgment.

7

(SPA-1–26; A-12 (ECF No. 83).) *Ketcham v. City of Mount Vernon*, No. 17-CV-7140 (AEK), 2023 WL 2734483, 2023 U.S. Dist. LEXIS 57079 (S.D.N.Y. Mar. 31, 2023). The District Court clerk entered the Judgment for Defendants-Appellees on April 3, 2023. (SPA-27.)[3]

On April 17, 2023, Mr. Ketcham filed a timely motion for reconsideration. (A-12 (ECF No. 85).) The District Court denied the motion in a text order dated March 29, 2024. (*Id.* at 13 (ECF No. 99).) Mr. Ketcham timely filed a notice of appeal from the March 31, 2023, Decision the same day.[4] (*Id.* (ECF No. 100); *id.* at 490–91 (Notice of Appeal).)

On April 10, 2024, the District Court issued a written opinion on Mr. Ketcham's motion for reconsideration. (*Id.* at 13 (ECF No. 101).) Mr. Ketcham did not amend his notice of appeal or file a second notice of appeal, and he does not appeal from the denial of his motion for reconsideration. (*See id.* (ECF No. 101); *id.* at 490–91 (Notice of Appeal).) Any factual findings or legal conclusions the District Court made in its April 10, 2024, opinion denying Mr. Ketcham's

---

3. Although the Clerk of the Court dated the Judgment March 31, 2023 (SPA-27), and the docket sheet reflects entry of the Judgment on March 31, 2023 (A-12 (ECF No. 84)), it was, in fact, entered on April 3, 2023. (*Id.* at 488–89.)

4. Because Mr. Ketcham filed a timely motion for reconsideration, his time to file a notice of appeal from the March 31, 2023, Decision and Judgment did not begin to run until the District Court denied that motion on March 29, 2024. Fed. R. App. P. 4(a)(4)(A)(iv).

motion for reconsideration are therefore not before the Court. *New Phone Co. v. City of New York*, 498 F.3d 127, 131 (2d Cir. 2007) ("Our jurisdiction . . . depends on whether the intent to appeal from [a] decision is clear on the face of, or can be inferred from, the notices of appeal."); *see also, e.g., Smith v. Barry*, 502 U.S. 244, 248 (1992) (holding that Federal Rule of Appellate Procedure 3 is "jurisdictional in nature").

## SUMMARY OF THE ARGUMENT

When Mount Vernon Police Officer Allen Patterson decided to arrest Ronald Ketcham on March 27, 2017, he had a duty to identify himself as a police officer. Had he done so, as the District Court found, "it is highly unlikely that the March 27, 201[7] encounter would have proceeded the way it did." (SPA-14.) Instead, Patterson, in plainclothes, got out of an unmarked car, advanced on Mr. Ketcham, asked him who he was, grabbed him, twisted his arm behind his back, pressed him into a fence, handcuffed him, and physically forced him into the back of the unmarked car—all without identifying himself as a police officer. That was objectively unreasonable, and no reasonable officer in Patterson's position could have concluded otherwise. Nevertheless, after a bench trial, the District Court found that Patterson's use of force was reasonable because Mr. Ketcham was "resisting arrest." That was error, and this Court should vacate the Judgment with instructions to enter judgment for Mr. Ketcham after determining damages.

9

This case centers on the third of three well-known "*Graham* factors"—*i.e.*, "whether [an arrestee] is actively resisting arrest or attempting to evade arrest by flight"—and whether that factor justified the use of force in this case. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The primary question presented is whether Patterson was justified in using force against Mr. Ketcham because he believed Mr. Ketcham was "resisting arrest." The answer is "no," but the District Court incorrectly answered, "yes." When an officer fails to identify themself as a police officer, it is unreasonable for that officer to justify using any physical force by claiming the citizen was "resisting arrest." A citizen is not "resisting *arrest*" when they do not know they are being arrested. A citizen does not know they are being arrested when the person grabbing them, handcuffing them, and pushing them into an unmarked car has not identified themself as a police officer. Those are the facts of this case. Rather than find that Patterson's use of force was reasonable, the District Court should have found that the use of any amount of force was unreasonable and therefore excessive under these circumstances.

Second, Patterson and Hutchins had, at most, reasonable suspicion to believe that Mr. Ketcham was Uzillia. They were therefore permitted, at most, to conduct a brief investigatory *Terry* stop to confirm or dispel that suspicion. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). Instead, they immediately proceeded

10

with a full-blown custodial arrest, injuring Mr. Ketcham in the process. Because an arrest was not justified under the circumstances, and there were no other factors present that justified the application of handcuffs, the force Patterson applied to effect Mr. Ketcham's arrest was entirely gratuitous and therefore excessive.

Third, the District Court's assessment of Mr. Ketcham's injuries as being insufficient to establish an excessive force claim cannot be squared with controlling caselaw and the evidence. The District Court required Mr. Ketcham to prove "that he sustained . . . serious physical injuries from the application of the handcuffs." (SPA-23.) However, this Court previously rejected the contention in this very case that "minor" injuries are insufficient to establish an excessive force claim. *Ketcham*, 992 F.3d at 150–51. The fact that Mr. Ketcham sustained actual physical injuries is all the law requires—injuries that the District Court inappropriately minimized as mere "temporary discomfort." (SPA-23.) Moreover, because it found no excessive force, the District Court did not consider Mr. Ketcham's compensable emotional distress damages and should be required to do so on remand when it determines damages.

Fourth, it was inappropriate in these circumstances for the District Court to rely on the time between when Mr. Ketcham complained about the handcuffs and when the Individual Defendants removed them when it analyzed Mr. Ketcham's excessive force claim. Because *all* of the force Patterson used was

gratuitous, it was apparent under the circumstances that the handcuffing itself was excessive force, so Mr. Ketcham was not required to prove that he first alerted the Individual Defendants to the pain the handcuffs were causing him.

Finally, the District Court's analysis of Mr. Ketcham's claim against Hutchins for his failure to intervene was erroneous. The District Court relied exclusively on the fact that it found no violation of Mr. Ketcham's constitutional rights. As discussed, that conclusion was error—and thus so, too, was the District Court's analysis of Mr. Ketcham's failure to intervene claim against Hutchins. Indeed, the District Court found that Hutchins was directly involved in handcuffing Mr. Ketcham; therefore, he had ample opportunity to intervene to prevent Patterson's use of excessive force and was, in fact, complicit in it.

## **LEGAL STANDARD**

When this Court reviews "a judgment following a bench trial in the district court," it reviews "the court's findings of fact for clear error and its conclusions of law de novo." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 96 (2d Cir. 2010). The Court also reviews a district court's "application of the law to the facts[] de novo." *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). "The reasonableness of police action is a 'mixed question of law and fact' that is reviewed de novo." *United States v. Reyes*, 353 F.3d 148, 151 (2d Cir. 2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

## **ARGUMENT**

Interacting with police officers can be a frightening experience, particularly when that interaction involves the use of force. *See Terry*, 392 U.S. at 24–25 ("Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience.") Such an interaction is all the more terrifying when a law-abiding citizen does not know that the person using force is, in fact, a police officer, because the officer did not identify themself as such. When a person, justifiably unaware that a police officer is trying to arrest them, takes reasonable measures to protect themself by assuming a defensive posture, instead of complying with orders that the person does not know are being given by a police officer, the officer should not then be permitted to rely *solely* on their own failure to appropriately identify themself as a valid legal justification to use physical force. That is precisely the conduct District Court excused below, and this Court should correct that error by vacating the Judgment.

[*remainder of page intentionally left blank*]

13

## POINT I

## ALL OF THE FORCE DEFENDANT-APPELLEE
## PATTERSON USED WAS EXCESSIVE

I.  **The District Court Misapplied the Third *Graham* Factor Because Patterson and Hutchins Failed to Identify Themselves as Police Officers, So No Reasonable Officer Could Have Believed That Mr. Ketcham Was Resisting Arrest**

To determine whether a police officer's use of force is reasonable, courts consider "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Collectively, these are known as the three "*Graham* factors." *Brown v. City of New York*, 798 F.3d 94, 102 (2d Cir. 2015).

The *Graham* factors create a standard to determine whether officers used a "degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (observing that *Graham* created an "objective reasonableness standard"). Subjective viewpoints are irrelevant to the analysis; what matters is objective reasonableness. *See, e.g., Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) ("It is well established that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." (citation omitted)); *see also Graham*, 490 U.S. at 397 ("[T]he question is whether the officers' actions are

14

'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Thus, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

The District Court correctly held that "[n]either of the first two *Graham* factors suggested in advance the need for any type of force to apprehend the individual who Patterson believed to be Uzillia." (SPA-20.) *See* pages 21–22 *infra*. However, the District Court incorrectly held that the third *Graham* factor— "whether the suspect is actively resisting arrest or attempting to evade arrest by flight"[5]—justified the use of force against Mr. Ketcham. (SPA-20.) Patterson and Hutchins failed to identify themselves as police officers, were traveling in an unmarked police car, and were wearing plainclothes, so the District Court's conclusion that "it [was] understandable that the officers understood Plaintiff to be positioning himself in a way that made it appear as though he was prepared to defend himself *rather than voluntarily comply with police requests*" was error, because, as an *objective* matter, no reasonable officer in those circumstances would

---

5. The District Court made no factual finding that Mr. Ketcham was "attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. To the contrary, the District Court found that Mr. Ketcham took "a defensive posture." (SPA-20.) The District Court's analysis therefore turned on its erroneous conclusion that the Individual Defendants reasonably believed, objectively, that Mr. Ketcham was "resisting arrest." (*See id.* at 20–21.)

15

have understood Mr. Ketcham to be failing to "comply with *police* requests." (*See id.* at 15 (emphasis added).) No reasonable officer would have *objectively* understood Mr. Ketcham to be "resisting arrest." (*See id.* at 20.)

Under New York law, a person is guilty of "resisting arrest only if she aware that she is being arrested." *Lowth v. Town of* Cheektowaga, 82 F.3d 563, 572 (2d Cir. 1996); *see also People v. Hutchinson*, 971 N.Y.S.2d 73, 73, 2013 N.Y. Misc. LEXIS 1383, at *2–4 (App. Div. 2d Dep't 2013) (vacating a judgment of conviction for resisting arrest as against the weight of the evidence where "the arresting officer . . . had never identified himself as a police officer to defendant, and . . . had never showed [a] warrant to defendant or told her that he had a warrant to arrest" a third-party, and concluding that, "in the absence of any knowledge on the part of defendant that the person seeking admittance to her apartment was a police officer and that he was performing an official authorized function," the defendant did not "intentionally resist[] arrest," even though the "defendant flailed her arms, punched and kicked the [arresting] officer numerous times, and pushed him"). Here, because the Individual Defendants failed to identify themselves as police officers, wore plainclothes, and traveled in an unmarked police car, "there was no evidence whatever that [Mr. Ketcham] had disobeyed any police order or had in any way resisted arrest." *Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015).

16

Indeed, the Individual Defendants "had ample reason to know that [Mr. Ketcham] had not realized [they were] police[men] at the time that [he] was 'resisting.' [His] consistent calls for police help while [they were] arresting [him] should have alerted [them] to [his] confusion." *Lowth*, 82 F.3d at 572–73. "Had [Patterson] clearly identified himself . . . [he] might reasonably expect [Mr. Ketcham] would 'actively resist arrest'"; but because the District Court credited Mr. Ketcham's account that Patterson did not identify himself and that Mr. Ketcham was, in fact, screaming for someone to call 9-1-1, Patterson "could not reasonably expect active resistance to an unidentified officer." *Atkinson v. City of Mount View*, 709 F.3d 1201, 1213–14 (8th Cir. 2013) ("Our emphasis on [the officer's] failure to identify himself flows directly from *Graham*'s third factor: it is convincing *evidence* that [the plaintiff] was neither 'actively resisting arrest nor attempting to evade arrest by flight.'" (quoting *Graham*, 490 U.S. at 396) (alteration adopted)).[6]

---

6. The District Court's observation that Mr. Ketcham "had *some inkling* during the encounter that Patterson was a police officer" is of no moment. (SPA-14 (emphasis added).) Mr. Ketcham's "inkling" was based at least in part on the fact that he "had a long service record as a law enforcement officer himself." (*Id.*) But, as mentioned, the inquiry is an *objective* one from the perspective of a reasonable officer; Mr. Ketcham's *subjective* "inkling" is irrelevant. *E.g.*, *Graham*, 490 U.S. at 396–97. Moreover, whatever "inkling" Mr. Ketcham may have had, the District Court found that he "did not understand that Patterson and Hutchins were police officers." (SPA-14.) Nor would Mr. Ketcham's brief view of Patterson's badge (*id.* at 3–4 (noting that Mr. Ketcham could not read anything on Patterson's badge), 14) necessarily

Ample caselaw demonstrates that a person is not "resisting arrest" in situations where police officers fail to identify themselves. Although it is obviously not binding on this Court, *McKinley v. Crevatas*, No. 20 Civ. 3606 (KPF), 2023 WL 4364182, 2023 U.S. Dist. LEXIS 115544, at *24–27 (S.D.N.Y. July 6, 2023), is particularly instructive. In that case, as here, there was no dispute "that Plaintiff thought he was being robbed when the officers first grabbed him." *Id.* at *25. The parties disputed at what point the police officers identified themselves as such, which was a material fact that precluded summary judgment. *Id.* The court concluded that, if a jury credited the plaintiff's version of events, it "could find that he was not aware that he was being arrested and was therefore entitled to reasonably protect himself." *Id.* "In short, if Plaintiff was resisting a perceived attack rather than a perceived arrest, the officers had no cause to arrest

------

indicate, as an objective matter, to an ordinary person that Patterson was a police officer, because Patterson failed to identify himself as an officer; a badge does not necessarily indicate that someone is a police officer. *See People v. Sajimi*, 872 N.Y.S.2d 692, 692, 2008 N.Y. Misc. LEXIS 4688, at *6–7 (N.Y. Cty. Crim. Ct. July 21, 2008) (granting a motion to dismiss a charge of Criminal Possession of a Forged Instrument in the Third Degree *where the defendant was wearing a badge*, noting that "[n]one of the facts alleged show that the defendant identified himself, used the item or acted in any manner that would indicate an intent to be perceived as a police officer"). Many professions carry badges, including security guards, bail bondsmen, firefighters, transit operators, sanitation workers, and prosecutors, among others. The same goes for the fact that Patterson had a holstered gun. (SPA-14.) *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 31 (2022) (noting "the general right to publicly carry arms for self-defense").

him." *Id.* at *26. Under those circumstances, the officers were not entitled to

qualified immunity, either. That was because if, akin to the facts here, "the officers

were dressed in plainclothes, did not verbally identify themselves as police

officers, and did nothing to indicate to Plaintiff that they were police officers until

a minute into their struggle, at which point Plaintiff stopped physically resisting," it

would have been "objectively unreasonable for the officers to believe they had

probable cause [to arrest him for resisting arrest and obstructing government

administration] based upon Plaintiff's reaction to them." *Id.* at *26–27. So too

here. It was objectively unreasonable for the Individual Defendants to believe that

Mr. Ketcham was resisting arrest or failing to "voluntarily comply with police

requests" (SPA-15) where they were likewise in plainclothes and did not identify

themselves as police officers.

   *McClellan v. Smith*, 439 F.3d 137, 147–49 (2d Cir. 2006), is another

useful guidepost. In that case, this Court vacated the grant of summary judgment

on qualified immunity grounds to a defendant police officer where the plaintiff did

not believe that the defendant was, in fact, a police officer, *despite having*

*identified himself. Id.* at 148. That was because, according to the plaintiff, the

officer "drove an unmarked car, honked his horn and made an obscene gesture,

acted in an agitated and possibly drunken manner, and responded to [the plaintiff's]

request to see identification in a 'loud and threatening voice stating that "he didn't

have to show any f---ing ID."" *Id.* (alteration adopted).  In other words, if a jury credited that plaintiff's version of events, it would have been objectively unreasonable for the defendant officer to believe that the plaintiff was resisting arrest because it was objectively reasonable for the plaintiff to believe he was not dealing with a police officer.  *Id.*  Nor would "'reasonable officers . . . disagree' as to the propriety of [the officer's] actions." *Id.* at 148–49.  Here, Mr. Ketcham had even less basis to believe that the Individual Defendants were police because, not only were they in an unmarked car, but they did not identify themselves as officers—even when Mr. Ketcham asked who they were.  (*See* SPA-15.)

Finally, even accepting that Mr. Ketcham's actions were the "assumption of a fighting stance" (*id.*), he was entitled to take reasonable measures to protect himself in a circumstance where he was unaware that he was being confronted by police officers.  That is because "a person being arrested . . . who has no actual knowledge that he is being arrested and the circumstances are such as to afford him no reasonable ground to suppose that he is being arrested . . . has a right to use reasonable force to defend himself." *United States v. Heliczer*, 373 F.2d 241, 248 (2d Cir. 1967).  And here, as the District Court found as a factual matter, Mr. Ketcham was unaware that Patterson and Hutchins were police officers and, in fact, believed he was being abducted or robbed.  (SPA-14, 16–17.)  In these circumstances, Mr. Ketcham's actions—"his adoption of a defensive physical

posture and his challenging responses to Patterson's questions" (*id.* at 20)—were therefore legally justified and could not serve as a valid basis for Patterson's use of force. It cannot be that the third *Graham* factor is satisfied when a law-abiding citizen does no more than they are legally entitled to do.

\* \* \*

The *Graham* test was designed to account for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. But this is not a case where the officers were forced to make a split-second decision about the amount of force to use.[7]

As the District Court correctly observed, "[t]he warrant for Uzillia's arrest was for the misdemeanor crime of forcible touching, which does not on its face suggest the need for a forceful response." (SPA-20 (citation omitted).) The

---

7. The District Court concluded the situation was "chaotic" and "not stable enough to enable Patterson or Hutchins to safely and reasonably double lock the cuffs." (SPA-24.) However, the District Court failed to account for the fact that it was a situation of the Individual Defendants' own making by "initiat[ing] the process of attempting to physically restrain [Mr. Ketcham] and take him into custody" (*id.* at 20–21) without first identifying themselves as police officers. That is, if any split-second decision-making were required, it was because the Individual Defendants' own failings created a "chaotic" situation. Police officers should not be permitted to create chaos unnecessarily and then rely on it to justify using physical force.

officers "had no reason to anticipate that Uzillia would pose an immediate threat," and, "as to the actual interaction with Plaintiff, Patterson testified that he did not feel he was in danger at any point, and neither Patterson nor Hutchins called for backup at any time during the incident." (*Id.*) Thus, going into the encounter with Mr. Ketcham, neither Individual Defendant had an objective basis for believing that force was necessary; and once the encounter began, neither officer had any reason to believe that Mr. Ketcham posed a danger to them. Nor did Mr. Ketcham attempt to flee, which might have added a sense of urgency for the Individual Defendants to act to restrain him; he instead took "a defensive physical posture." (*Id.*)[8] On that score, the only circumstances that the District Court found that justified the use of force were Mr. Ketcham's "adoption of a defensive physical posture and his challenging responses to Patterson's questions and statements." (*Id.* at 20.) No "split-second" judgment was necessary in these circumstances for the Individual Defendants to take the reasonable step of first identifying themselves as officers before they applied force to arrest Mr. Ketcham—namely, pushing Mr. Ketcham against a fence, applying handcuffs, and failing to "double lock" the handcuffs they used, injuring Mr. Ketcham in the process. Indeed, "if

---

8. The District Court did "not find at all credible Patterson's testimony that Plaintiff initiated contact during the encounter *by attempting to push past him* and 'body checking' him." (SPA-14 (emphasis added).)

Patterson had clearly identified himself in this way, it is highly unlikely that the March 27, 201[7] encounter would have proceeded the way it did." (*Id.* at 14.)

As mentioned, and as the District Court found, Mr. Ketcham did not know at that time that Patterson and Hutchins were police officers and, in fact, he feared that he was being robbed or abducted. (*E.g.*, *id.* at 14, 16.) And the reason Mr. Ketcham did not know—both subjectively and objectively—that the Individual Defendants were police officers was because they failed to identify themselves as officers. (*Id.* at 14.) Rather than hold the officers accountable for their failure, the District Court penalized Mr. Ketcham for acting the way a reasonable person in his circumstances would have behaved—and, more importantly, in a way that a reasonable officer on the scene would have expected him to behave. *See Atkinson*, 709 F.3d at 1213–14. Mr. Ketcham did nothing more than what he was legally entitled to do under the circumstances, *Heliczer*, 373 F.2d at 248, and the District Court erred by finding that that legal and objectively reasonable conduct sufficed to satisfy *Graham*'s third factor.

## II.     Patterson and Hutchins Should Have Conducted, At Most, a *Terry* Investigatory Stop Before Forcibly Arresting Mr. Ketcham

All of the force used in effectuating Mr. Ketcham's arrest was unjustified and therefore excessive because, not only did all of the *Graham* factors weigh against finding the use of force reasonable, but the Individual Defendants also lacked probable cause to arrest Mr. Ketcham in the first place. The officers

had, at most, reasonable suspicion. Although the District Court correctly concluded that the Individual Defendants, in fact, placed Mr. Ketcham under arrest (*e.g.*, SPA-20–21), it made no specific finding that the officers had probable cause to believe Mr. Ketcham was Uzillia and thus that the arrest was permissible—a question that this Court would review *de novo* in any event, *see United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015)—though the District Court *did* erroneously conclude that the Individual Defendants "were . . . reasonably under the impression that Plaintiff *was* Uzillia" (SPA-21). However, the quantum of suspicion the officers had that Mr. Ketcham was Uzillia bears directly on the level of force that was permitted under the circumstances. *E.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) ("In *Graham*, we held that determining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of *the nature and quality of the intrusion* on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" (emphasis added) (quoting *Graham*, 490 U.S. at 396)); *Tobing v. City of New York*, 929 F. Supp. 86, 89 (E.D.N.Y. 1996) (observing that "the reasonableness of the force used turns, in part, upon the level of the Fourth Amendment intrusion"); *accord Negron v. City of New York*, 976 F. Supp. 2d 360, 371 (E.D.N.Y. 2013); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 313 (S.D.N.Y.

1998).[9]  For instance, if they had probable cause, they could have arrested Plaintiff;

if they had less than probable cause but at least reasonable suspicion, they were

permitted to conduct no more than a temporary investigative *Terry* stop.  *See, e.g.*,

*Dunaway v. New York*, 442 U.S. 200, 207–09 (1979).

      Here, when Patterson encountered Mr. Ketcham, he immediately

began the process of placing him under arrest, "including the use of the arm bar

technique, the application of handcuffs, and placing Plaintiff against [a] chain link

fence."  (SPA-21.)  He did so on his incorrect *suspicion* that Mr. Ketcham was

Uzillia, the man for whom the Individual Defendants were searching.  (*Id.*)  Before

applying force to arrest Mr. Ketcham, Hutchins and Patterson should have first

conducted, at most, an investigatory *Terry* stop to confirm or dispel their suspicion.

*See, e.g.*, *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a

---

9.  To be clear, Mr. Ketcham does not argue that an arrest lacking probable cause establishes an excessive force claim *per se*.  *See Papineau v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006) (making clear that there is no special test or *per se* rule for arrests lacking probable cause: "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used").  However, under the specific facts of this case, where none of the *Graham* factors justified the use of force, and where the Individual Defendants lacked probable cause to arrest Mr. Ketcham, the force used to arrest Mr. Ketcham was necessarily excessive because the force was used during an undertaking (arresting Mr. Ketcham) that the officers lacked legal authority to do.  Put differently, there was no need (or legal basis) to arrest Mr. Ketcham, and no *Graham* factor otherwise justified the use of force, so Patterson's shoving and injurious application of handcuffs to Mr. Ketcham was entirely gratuitous and therefore excessive.

reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in *or is wanted in connection with a completed felony*, then a *Terry* stop may be made to investigate that suspicion." (emphasis added)); *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984) (observing that, during a *Terry* stop, an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions," that "the detainee is not obliged to respond," and that, "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released"); *cf. Graham*, 490 U.S. at 397 ("[A]n officer's good intentions [do not] make an objectively unreasonable use of force constitutional."). We specify that the circumstances justified a *Terry* stop "at most" because the officers could have, and should have, conducted a non-custodial inquiry by identifying themselves and asking Mr. Ketcham questions, or simply approaching Mr. Ketcham and comparing him to the photo of the wanted suspect. It was unnecessary even to conduct a stop, much less an arrest.

"An officer has probable cause to arrest where [s]he is in possession of reasonably trustworthy information concerning facts and circumstances sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017) (alteration adopted) (citation omitted). "[C]ommon

rumor or report, suspicion, or even strong reason to suspect" do not establish probable cause. *Henry v. United States*, 361 U.S. 98, 101 (1959) (citation omitted); *see also Mallory v. United States*, 354 U.S. 449, 454 (1957) (comparing "mere suspicion" with "probable cause"). Moreover, "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)); *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 386–87 (S.D.N.Y. 2009) ("[I]n assessing probable-cause questions Second Circuit case law stresses the importance of investigation and corroboration." (citation omitted)).

Here, the meager similarities between Mr. Ketcham and Uzillia were insufficient to establish the probable cause required before making an arrest. (*See* A-464 (Defs.' Trial Ex. C).) Based on the photograph of Uzillia, one can tell that Mr. Ketcham and Uzillia are both mustachioed, bald, white men, but the resemblance ends there.[10] The following, relevant facts were not discussed in the District Court's Decision:

---

10. Defendant-Appellee Patterson testified that he and Defendant Hutchins were looking for Uzillia in "New Rochelle," a city of more than 80,000 people. *See* United States Census Bureau, "New Rochelle City, New York," *https://www.census.gov/quickfacts/newrochellecitynewyork* (last accessed July 12, 2024); *see also, e.g.*, *Victoria Cruises, Inc. v. Yangtze Cruises, Inc.*, 630 F. Supp. 2d 255, 263 n.3 (E.D.N.Y. 2008) ("The Court can take judicial notice of government statistics."). Patterson was unable to describe the

(1) Patterson had never met Uzillia in person (A-283 (Trial Tr. at 244));

(2) The Individual Defendants do not claim they considered any information about Uzillia's physical appearance other than his headshot photograph—such as his height, weight, or age;

(3) The headshot photograph, received in evidence as Defendants' Exhibit C (*id.* at 464), depicts only Uzillia's head and neck, and not the rest of his body;

(4) The headshot photograph of Uzillia is blurry and pixelated;

(5) Uzillia's eye and hair color cannot be readily determined from the headshot photograph;

(6) Uzillia appears in the headshot to be significantly younger than Mr. Ketcham was at the time the Individual Defendants arrested him;

(7) Uzillia is not wearing eyeglasses in the photograph, whereas Mr. Ketcham was wearing eyeglasses at the time of the encounter (*id.* at 50 (Trial Tr. at 11));

(8) Mr. Ketcham was wearing both a hat and a hooded sweatshirt with the hood up at the time of the encounter (*id.*);

(9) Patterson and Hutchins observed Mr. Ketcham very briefly, from a moving car (*id.* at 200–01 (Trial Tr. at 161–62));

(10) Patterson told his partner that his intention was to "investigate," rather than arrest, Mr. Ketcham (*id.* at 200–02 (Trial Tr. at 161–63)); and

---

location with any greater specificity. (A-198 (Trial Tr. at 159) ("I don't remember the exact address, but it was an apartment building").) Neither Individual Defendant ever testified that they found Mr. Ketcham in the vicinity of "an apartment building."

(11)  Patterson and Hutchins did not even attempt a side-by-side comparison of the photograph and Mr. Ketcham before arresting Mr. Ketcham.

Absent any other indicia that they had the right person, Patterson's drive-by comparison of Plaintiff-Appellant to the pixelated headshot of Uzillia (*id.* at 464 (Defs.' Trial Ex. C)) without making "further inquiry," *see Manganiello*, 612 F.3d at 161 (citation omitted), was insufficient to establish probable cause.

Indeed, in cases involving mistaken identity, courts have struggled to determine whether an arrestee's resemblance to a suspect in a photograph is enough to constitute *reasonable suspicion*, let alone probable cause. *Compare United States v. Walker*, 965 F.3d 180, 187, 189 (2d Cir. 2020) (holding that "the characteristics of the suspect identified by the district court based on [a] photograph—black male, medium-to-dark skin tone, glasses, facial hair, and long hair" evinced an "*extreme* lack of reasonable suspicion" (citations omitted)); *Clayborne v. Brown*, No. 20-cv-3145, 2023 WL 2581296, 2023 U.S. Dist. LEXIS 46312, at *15–17 (C.D. Ill. March 20, 2023) (finding a genuine dispute of material fact as to whether detectives had *reasonable suspicion* where the sole basis for their suspicion was a comparison of a suspect in security video footage and a photograph of the plaintiff and the detectives' conclusion that the plaintiff "resembled the suspect" (alteration adopted)), *with United States v. Zamarripa*, No. CR-10-2025-FVS, 2010 WL 3021862, 2010 U.S. Dist. LEXIS 76535, at *5 (E.D.

29

Wash. July 29, 2010) (the resemblance of a person being stopped to a suspect in a photograph sufficed to establish *reasonable suspicion*); *United States v. Davis*, No. 06-CR-272-1, 2007 WL 2728969, 2007 U.S. Dist. LEXIS 69214, at *10–11 (E.D. Pa. Sept. 19, 2007) (finding *reasonable suspicion* where the defendant "resembled a photograph that the agents had of" a suspect, and the "[d]efendant was acting suspiciously" by, *inter alia*, "wearing a heavy winter coat when the weather was mild" and "continually pac[ing] and look[ing] furtively towards the agents'[] unmarked car").

Moreover, in cases where courts have excused an officer's mistake of identity, there were additional factors supporting the officer's suspicion or otherwise justifying their application of force. For example, in *Hill v. California*, 401 U.S. 797 (1971), the officers' reasonable good faith mistake did not render the mistaken arrest of an innocent person unreasonable, but those officers had much more than a grainy photograph: *inter alia*, the police were at the suspect's address; the mailbox had the suspect's name on it; the person who answered the door fit a description of the suspect "from various sources"; and "there was a lock on the door and [the innocent person's] explanation for his mode of entry was not convincing." 401 U.S. at 802–04; *see also Gonzalez v. City of New York*, 69 F. App'x 7, 10 (2d Cir. 2003) (summary order) (finding that an officer's mistake of identity was reasonable where "the investigators knew that two computer searches

30

based upon the [arrestee's] name and birth date returned information on Ramon

Perez, who used the alias 'Saul Gonzalez' [*i.e.*, the arrestee's name]," and they

"also used a computer matching program to find that Ramon Perez's 1987 arrest

photograph and [the arrestee's] department of motor vehicles photograph were

very similar"); *United States v. Valez*, 796 F.2d 24, 26–27 & n.1 (2d Cir. 1986)

(excusing an officer's mistake of identify where the arrestee matched a "detailed

description" of the person sought—"an Hispanic male who, at the time of his

arrest, was 25 and was wearing a black leather jacket, a light grey V-neck shirt with

dark trim on the collar, and grey pants with a comb in the back pocket"—and

police officers "needed to respond quickly to the [perpetrator's] disappearance

from the street corner"); *United States v. Manley*, 632 F.2d 978, 983–84 (2d Cir.

1980) (excusing an officer's mistake of identity where, *inter alia*, the perpetrator

used the last name of the arrestee as an alias, the two men "had similar lifestyles,

were both described as of Jamaican ancestry and had certain physical likenesses"

though "different in appearance," "three citizens had made positive identifications

of [the arrestee] as the fugitive being sought from a photograph" of the perpetrator,

a neighbor "called DEA headquarters to say that the individual was currently at

home," and the arrestee "hastily retreated to the interior of his house where he

briefly attempted to barricade himself"); *United States v. De Leon*, 561 F.2d 421,

423 (2d Cir. 1977) (per curiam) (finding probable cause where a complaining

witness "provided an accurate description of [the perpetrator's] highly distinctive automobile," which he "later identified . . for the police"; the person arrested "also fit the general description of the men who entered [the complaining witness's] store"; and the arrestee's "action in locking [his] door also tended to implicate him").

Here, the Individual Defendants identified no other factors—*i.e.*, aside from Patterson's drive-by comparison of Mr. Ketcham to the pixelated headshot of Uzillia—that would indicate that Plaintiff was Uzillia. The trial record lacks any evidence about each person's height, weight, build, hair color, eye color, age, scars, tattoos, or other distinguishing characteristics. Finally, the District Court utterly failed to address Mr. Ketcham's testimony that he was wearing both a baseball cap and a hooded sweatshirt with the hood up (A-50 (Trial Tr. at 11))—facts that significantly diminished any opportunity to compare Mr. Ketcham to the headshot of Uzillia. Based on these facts, no "person of reasonable caution" would believe that Mr. Ketcham "ha[d] committed or [wa]s committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). In the absence probable cause or of other facts justifying the use of force, such as whether Mr. Ketcham "had threatened [an] officer with significant harm," *Papineau*, 465 F.3d at 62, the force Patterson employed to arrest Mr. Ketcham was entirely excessive.

## POINT II

## THE DISTRICT COURT ERRED BY REQUIRING MR. KETCHAM TO PROVE "SERIOUS PHYSICAL INJURIES" TO WHICH HE ALERTED THE INDIVIDUAL DEFENDANTS

### I.     Mr. Ketcham Was Not Required to Prove Serious Physical Injuries

The District Court mistakenly required Mr. Ketcham to prove "by a preponderance of the evidence that he sustained . . . serious physical injuries from the application of the handcuffs." (SPA-23.)  That is not a requirement to establish an excessive force claim.  *E.g.*, *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.").  On that score, the District Court failed to follow this Court's prior decision in this very case—a decision the District Court cited only for the proposition that "pushing an arrestee's head into a police car door can constitute excessive force" (SPA-21), and in its recitation of the procedural history of this litigation (*id.* at 2).  As this Court previously explained, even minor injuries can constitute excessive force; a contrary rule "would grant a windfall to officers who commit misconduct but could escape liability based upon the hardiness of their victims."  *Ketcham*, 992 F.3d at 150–51.  Rather, the seriousness of the injuries a plaintiff has suffered goes to "the reasonableness of the force and potential damages from any misconduct."  *Id.* at 151.  To the extent the District Court relied on a "consensus" of district court decisions that "some injury

beyond temporary discomfort" is a prerequisite to establishing an excessive force claim (SPA-23 (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)), reliance on that "consensus" is inconsistent with this Court's prior decision in this case (and others) and is an incorrect application of the law; an actual injury is all that is required. *E.g.*, *Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998) (holding that a plaintiff is entitled to compensatory damages if there is "proof of actual injury" that was "proximately caused by the constitutional violation").

Moreover, the District Court's conclusion that Mr. Ketcham's injuries were "relatively minor and short-lived" or mere "temporary discomfort" is incongruous with the actual injuries that the District Court found Mr. Ketcham sustained—broken skin and bruising that was painful and lasted for several days—which, as mentioned, are compensable injuries. (SPA-23 (citation omitted); *see* A-465–69 (Pl.'s Trial Ex. 1).) While bruising and broken skin can be minimized as "discomfort," and while many injuries can be characterized as "temporary" in the sense that they heal and do not result in permanent pain or disfigurement, that does not diminish the pain they cause or the fact that they are actual injuries for which Section 1983 provides recourse. *See Atkins*, 143 F.3d at 103; *see also, e.g.*, *Ketcham,* 992 F.3d at 150–51; *Jones v. Treubig*, 963 F.3d 214, 239 (2d Cir. 2020) ("[I]t is well established that, although the absence of significant injury is relevant

34

to the question of excessive force, it is not dispositive under a Fourth Amendment analysis."); *McLaurin v. Falcone*, No. 04-4849-cv, 2007 U.S. App. LEXIS 1839, at *5 n.3 (2d Cir. Jan. 25, 2007) (summary order) ("We have made it clear that the injuries suffered need not be permanent or severe to recover under an excessive force claim[.]" (citing *Robison*, 821 F.2d at 924)); *Jackson v. City of New York*, 939 F. Supp. 2d 235, 253 (E.D.N.Y. 2013) ("[C]ourts in the Second Circuit have allowed plaintiffs to pursue excessive force and unreasonable handcuffing claims even where the injury was not permanent or severe, where the force used was excessive and gratuitous."); *cf. Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (observing that "seriousness of the injury does not appear to be an element of a New York assault claim").[11]

Finally, because the District Court erroneously found that Mr. Ketcham failed to establish an excessive force claim, the District Court had no occasion to consider the compensable psychological and emotional harms he suffered. (*See* SPA-7–8 (describing these harms, including Mr. Ketcham's testimony that he was "thoroughly traumatized" and "deliberately avoids the area

---

11. The District Court also found for Defendants-Appellees on Mr. Ketcham's state-law assault and battery claims, following the same analysis it applied to Mr. Ketcham's Fourth Amendment excessive force claim. (SPA-25–26.) Because the District Court's analysis of Mr. Ketcham's Fourth Amendment claim was erroneous, so, too, was its analysis of Mr. Ketcham's state-law claims.

where the incident took place").) However, "[i]t is well-established that courts may award emotional distress damages in section 1983 cases." *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002). On remand, the District Court should properly account for these non-physical compensable injuries to determine an appropriate damages award.

## II. The District Court Erred By Relying on the Fact That the Individual Defendants Removed Mr. Ketcham's Handcuffs Shortly After He Complained About Them Because Patterson's Application of Handcuffs Itself Was Plainly Unreasonable Under the Circumstances

The District Court incorrectly focused on the fact that Mr. Ketcham's handcuffs were removed shortly after he alerted the officers to the pain that they were causing him (SPA-22) because Patterson's application of handcuffs was plainly unreasonable. In the same section of the Decision in which the District Court discussed the degree of Mr. Ketcham's injuries, the District Court quoted extensively from this Court's decision in *Cugini v. City of New York*, 941 F.3d at 612–13, as standing for the proposition that courts should apply a three-factor test to analyze excessive force claims involving handcuffing. (SPA-21–22.) However, in *Cugini*, this Court was merely quoting from a district court decision, noting that the test "has often been employed by other district courts in this Circuit." 941 F.3d at 612–13.[12] This Court continued to explain that, although those "factors may,

---

12. Those factors are: "(1) the arrestee's handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the handcuffs were too

indeed, prove useful to a district court in assessing the soundness of a handcuffing-based excessive force claim, . . . [a] court's reasonableness analysis is not limited to a factual checklist." *Id.* at 613.

Rather, the overarching question is "whether an officer reasonably should have known during handcuffing that his use of force was excessive." *Id.* ("Thus a plaintiff asserting a claim for excessive force *need not always establish that she alerted an officer* to the fact that her handcuffs were too tight or causing pain." (emphasis added)). A plaintiff can satisfy this requirement if "the unreasonableness of the force used was apparent under the circumstances." *Id.* (holding that "where an officer's use of force in handcuffing is plainly unreasonable under the circumstances *or* where a plaintiff manifests clear signs of her distress—verbally or otherwise—a fact finder may decide that the officer reasonably should have known that his use of force was excessive for purposes of establishing a Fourth Amendment violation").

The District Court invoked the proper standard but nevertheless analyzed Mr. Ketcham's claim using the three-factor test that this Court noted, but

---

tight; and (3) the degree of injury to the arrestee's wrists." *Id.* at 612 (alterations adopted) (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)). The District Court's discussion of the extent of Mr. Ketcham's injuries was apparently an effort to analyze the third factor of this test that "may" be "useful," but that does not provide the governing standard. *See id.* at 613.

37

did not adopt, in *Cugini*. (SPA-22–24 (focusing on, *inter alia*, the facts that Mr. Ketcham "only complained once to Patterson and Hutchins about the handcuffs," that Mr. Ketcham's injuries were not "serious," and "that the handcuffs were removed 'within seconds' of him making his complaint").) Those factors may be "useful" in some cases, but they are not helpful here, where, as discussed below, it was "apparent under the circumstances" that the application of handcuffs was *itself* uncalled for because it was not justified by any of the *Graham* factors—or even by a valid arrest. *See Cugini*, 941 F.3d at 613.

Here, Patterson's application of handcuffs, pushing of Mr. Ketcham against a fence, and pushing his head into the side of the car (*see* SPA-16–17, 23) were entirely gratuitous and thus excessive because, *inter alia*, Mr. Ketcham, in fact, "offered no resistance" to a duly issued police command, *see Rogoz*, 796 F.3d at 251; no other *Graham* factor justified the use of force (SPA-20); and the Individual Defendants lacked probable cause to arrest Mr. Ketcham in the first place. Because neither Individual Defendant identified himself as a police officer (and both were in plainclothes and an unmarked car), and because Mr. Ketcham's pleas for help would have alerted a reasonable police officer to the fact that he did not realize the Individual Defendants were, in fact, police officers, "the unreasonableness of the force used was apparent under the circumstances." *See Cugini*, 941 F.3d at 613. As discussed above, in these circumstances, no amount of

38

force, whether by applying handcuffs or otherwise, was justified, and no reasonable officer could disagree. Patterson's use of force by handcuffing Mr. Ketcham at all before identifying himself as a police officer—let alone applying the handcuffs in a way that caused Mr. Ketcham visible physical injuries by failing to "double lock" them—was thus "plainly unreasonable." *See id.*

That should end the analysis. In these circumstances, Mr. Ketcham was not required to demonstrate that he first alerted the Individual Defendants to his pain. *See id.* That is particularly true because both officers knew that they were supposed to, but did not, "double lock" the handcuffs or else they could (and, in fact, did) continue to tighten around Mr. Ketcham's wrists (*see* SPA-12, 23)— and they would have had the opportunity to do so but for Mr. Ketcham's "resisting arrest" due to the officers' failure to identify themselves (*see id.* at 23–24). Put differently, because *Graham* provides the proper standard for assessing excessive force claims, and no *Graham* factor justified the use of force, the District Court erred by relying on the factors this Court identified in *Cugini* to deem reasonable force that was excessive under *Graham*.

## POINT III

### BECAUSE THE DISTRICT COURT ERRED BY FINDING THAT PATTERSON'S USE OF FORCE WAS REASONABLE, ITS ANALYSIS OF MR. KETCHAM'S FAILURE TO INTERVENE CLAIM AGAINST HUTCHINS WAS ALSO ERRONEOUS

The District Court's entire analysis of Mr. Ketcham's claim that

Hutchins failed to intervene to prevent Patterson's excessive use of force consists of a single sentence: "Because the Court has concluded that there was no use of excessive force during the March 28, 2017 encounter with Plaintiff, Hutchins cannot be liable on a theory of failing to intervene, as there was no constitutional right being violated during the incident." (SPA-25.) That analysis does not withstand scrutiny because it rests on a faulty premise: that there was no violation of Mr. Ketcham's rights. As explained above, Patterson used excessive force because, under the circumstances here, no reasonable officer would have applied any amount of force without first announcing themself as a police officer.

If the District Court had correctly found a deprivation of Mr. Ketcham's constitutional rights, then its factual findings would have compelled the conclusion that Hutchins is liable for failing to intervene to prevent Patterson's use of excessive force. That is because the District Court "credit[ed] Hutchins's testimony that he was directly involved in the process of placing handcuffs on" Mr. Ketcham. (SPA-16.) Accepting that factual finding as true, as Mr. Ketcham does in this appeal, Hutchins had ample "opportunity to intervene to prevent the harm from occurring." *Lennox v. Miller,* 968 F.3d 150, 158 (2d Cir. 2020) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *see also Figueroa v. Mazza*, 825 F.3d 89, 107–08 (2d Cir. 2016) ("The essential inquiry [in failure to intervene cases] is whether, under the circumstances actually presented, an officer's failure to

intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)).  Because Hutchins was, as the District Court found, *directly involved* in handcuffing Mr. Ketcham, he was a "tacit collaborator" in Patterson's excessive use of force in connection with handcuffing Mr. Ketcham.  *See Figueroa*, 825 F.3d at 107–08.  A contrary holding would be inconsistent with the District Court's unchallenged factual findings.

## CONCLUSION

When a police officer wearing plainclothes and driving an unmarked police car accosts an unsuspecting and law-abiding citizen without first identifying themself as a police officer, it is objectively reasonable for the citizen to (1) be unaware that their accoster is a police officer and (2) take reasonable steps to defend themself from a perceived attack.  Under those circumstances, no reasonable officer would understand the citizen to be resisting arrest, particularly where, as here, the citizen is, in fact, repeatedly shouting out for someone to *call the police* for help—and even then, the officer does not identify himself as a police officer.  The officer should not be permitted to rely *solely* on the citizen's reasonable and legal actions to then use force, especially force that caused visible physical injuries and pain that persisted for days—even force consisting of an application of handcuffs that might have been reasonable under different

circumstances. That is exactly the misconduct the District Court erroneously excused as being objectively reasonable, and this Court should correct that error.

For the reasons set forth above, Plaintiff-Appellant respectfully requests that this Court vacate the District Court's Judgment and remand the case with instructions to enter judgment for Mr. Ketcham after determining damages.

Dated:     New York, New York
           July 12, 2024

DAVID B. SHANIES LAW OFFICE

_____/s/ David B. Shanies_____
David B. Shanies
Tristan M. Ellis
110 West 40th Street, Tenth Floor
New York, New York 10018
Tel. (212) 951-1710
Fax (212) 951-1350
*david@shanieslaw.com*
*tristan@shanieslaw.com*

*Counsel for Plaintiff-Appellant*
*Ronald Ketcham*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENT, AND TYPE-STYLE REQUIREMENTS

I, Tristan M. Ellis, counsel for Plaintiff-Appellant, hereby certify the following:

1.  The foregoing document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 2d Cir. L.R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 10,233 words, as calculated by the word processing software used to prepare the document.

2.  The foregoing document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, Microsoft Office 365 version, in 14-point Times New Roman font.

_____
/s/ Tristan M. Ellis

Dated: July 12, 2024

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Page**

Opinion and Order, dated
March 31, 2023.................................................................SPA-1

Clerk's Judgment, dated
March 31, 2023...............................................................SPA-27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RONALD KETCHAM,

                              Plaintiff,                       **OPINION AND ORDER**

         -against-                            17-cv-7140 (AEK)

THE CITY OF MOUNT VERNON, ALLEN
PATTERSON, and MICHAEL HUTCHINS,

                              Defendants.

------------------------------------------------------------X

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

       Plaintiff Ronald Ketcham ("Plaintiff") brought this action against Defendants City of

Mount Vernon, Allen Patterson, and Michael Hutchins (collectively, "Defendants"), asserting

federal claims pursuant to 42 U.S.C. § 1983 for excessive force and unlawful seizure and arrest,

and claims pursuant to New York State law for battery, assault, and unlawful imprisonment.

ECF No. 16.[2]  The parties subsequently agreed to the dismissal of Plaintiff's claims for unlawful

seizure and arrest and false imprisonment, and their stipulation was so ordered by the Honorable

Vincent L. Briccetti on February 27, 2019.  ECF No. 38.  On December 30, 2019, Judge Briccetti

issued an opinion and order granting Defendants' motion for summary judgment, and the Clerk

---

[1] The parties have consented to the Court's jurisdiction pursuant to 28 U.S.C. § 636(c).
ECF No. 59.

[2] This case originally was filed on September 19, 2017, *see* ECF No. 1, but the operative
pleading is the amended complaint, which was filed on November 30, 2017, *see* ECF No. 16.
The defendants in the original complaint were the City of Mount Vernon and "John Does
Numbered 1 and 2."  *See* ECF No. 1.  In the amended complaint, Patterson and Hutchins were
named and references to "John Does" were eliminated.  *See* ECF No. 16.  The John Doe
defendants therefore should have been removed as parties as of the filing of the amended
complaint on November 30, 2017, yet they are still mistakenly listed as active defendants on the
docket.  The Clerk of Court is respectfully directed to terminate the John Doe defendants.

of Court issued a judgment in favor of Defendants for the reasons stated in the December 30,

2019 decision.  ECF Nos. 50, 51.  Plaintiff filed a timely notice of appeal on January 3, 2020.

ECF No. 52.  By decision dated March 29, 2021, the Second Circuit Court of Appeals vacated

the judgment of the district court and remanded the case for further proceedings consistent with

that opinion; the mandate from the Court of Appeals was issued on April 19, 2021.  ECF Nos.

53, 54; *see Ketcham v. City of Mount Vernon*, 992 F.3d. 144 (2d Cir. 2021).  Upon remand, the

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c), ECF No.

59, and subsequently withdrew their previously filed jury demands and consented to a bench trial

pursuant to Rule 38(d) of the Federal Rules of Civil Procedure, ECF No. 62.

The Court conducted a two-day bench trial on November 1, 2021 and November 2, 2021,

with closing arguments delivered on November 4, 2021.  Plaintiff and his wife, Patricia

Ketcham, testified on Plaintiff's behalf, and Patterson and Hutchins testified on behalf of

Defendants.  For the reasons that follow, the Court finds that Plaintiff has not proven any of his

claims by a preponderance of the evidence.

## FINDINGS OF FACT

The Court makes the following findings of fact as required by Rule 52 of the Federal

Rules of Civil Procedure.

### I.        Prelude

On March 28, 2017 at approximately 4:30 p.m., Plaintiff, a retired United States

probation officer, was walking along Main Street in New Rochelle, New York on his way to a

nearby market.  Trial Transcript ("Tr.") 9-11.

Meanwhile, that same afternoon, Patterson and Hutchins were working on the Warrant

Squad of the City of Mount Vernon Police Department.  Tr. 157, 280.  Patterson and Hutchins

were seeking to execute multiple warrants that day, including an arrest warrant for an individual

named Dominic Uzillia, who was wanted for the misdemeanor offense of forcible touching.  Tr.

157-58, 282.  Patterson and Hutchins had attempted to find Uzillia several times before March

28, 2017, and had focused their efforts to locate him in the City of New Rochelle, as they had a

known address for Uzillia there.  Tr. 158-59, 282-83.  As their shift progressed, the officers

drove from Mount Vernon to New Rochelle in their assigned vehicle, a light blue unmarked

Crown Victoria equipped with lights and sirens, with Hutchins driving and Patterson in the front

passenger's seat.  Tr. 160-61, 284.  The officers had a picture of Uzillia with them.  Tr. 159-60,

285; *see* Defs.' Ex. C.  As the officers traveled northbound in their vehicle along Main Street,

Patterson indicated to Hutchins that he saw someone who fit Uzillia's description walking

southbound on the sidewalk on Main Street, and told Hutchins to stop the car so they could

investigate.  Tr. 161-63, 285-86.

## II.     The Encounter between Plaintiff and Defendants Patterson and Hutchins

The parties' accounts of what happened next differ sharply.

### A.     Plaintiff's Testimony

According to Plaintiff, he first heard car brakes "screeching" on his right-hand side, and

when he turned in that direction, he saw an individual approaching him quickly.  Tr. 11, 73.[3]

Patterson appeared to have exited the passenger side of an unmarked blue-gray sedan, and was

approximately three to five feet away from Plaintiff when Plaintiff first observed him.  Tr. 12.

Patterson was dressed in plain clothes, and Plaintiff testified that Patterson did not identify who

he was or display anything identifying himself as a police officer.  Tr. 12-13.  At some point as

---

[3] Throughout his trial testimony, Plaintiff referred to the individual who approached him only as the "passenger."  *See, e.g.*, Tr. 12, 73.  There is no dispute, however, that person who Plaintiff referred to as the "passenger" was, in fact, Patterson.

Patterson approached him, Plaintiff saw that Patterson was wearing a badge or shield around his
neck, but Plaintiff could not read any numbers or letters on the shield.  Tr. 15, 75.  While
Patterson was approaching, Plaintiff was standing approximately three feet from a chain link
fence that surrounded a gas station that was under repair; Plaintiff's back was positioned toward
the fence.  Tr. 14, 80.

The first thing Plaintiff heard Patterson say was "who are you?," to which Plaintiff
answered, "who are you?"  Tr. 13, 76.  Plaintiff testified that although Patterson had come "very
close" to him, Plaintiff did not physically react, and remained "frozen."  Tr. 74, 76-77.  Patterson
then said to Plaintiff, "I'm taking you in," and Plaintiff responded, "for what?," and asked to see
a uniformed police officer.  Tr. 13, 15.  Plaintiff testified that Patterson did not respond and
instead grabbed Plaintiff's wrist, spun him around, twisted his wrist behind him, and pushed it up
behind his shoulder blades.  Tr. 13-14, 83-84.  Within seconds, Plaintiff started "screaming at the
top of [his] lungs."  Tr. 79-80.

Patterson proceeded to push Plaintiff toward the chain link fence, and at various points
different parts of the front of Plaintiff's body, including his head, chest, and knees, were in
contact with the fence.  Tr. 14.  Plaintiff testified that he did not exert any force as Patterson
pushed him against the fence, as Patterson's hold had "immobilized" him.  Tr. 14-15, 18.
Plaintiff testified that he was frightened, and did not know if he was being abducted or robbed.
Tr. 14.  According to Plaintiff he was up against the fence for approximately "a minute or two";
during that entire time he was moving his head from the left to the right and screaming, asking
for people on the street to help and to call 9-1-1.  Tr. 17, 84-86, 89.  Plaintiff screamed to the
point that his voice became hoarse, Tr. 17, but no bystanders intervened.  As he was pressed
against the fence, Plaintiff noticed that Patterson carried a handgun that was "properly

holstered." Tr. 86. As Plaintiff yelled, he recalled hearing Patterson say "two or three times"

that he would "put [Plaintiff] on [his] knees"—a statement that Plaintiff found "frightening"

because he had previously undergone a knee replacement in 2012, and had two prosthetic knees.

Tr. 17-18. At no point during this incident did Patterson actually "put Plaintiff on his knees" or

attempt to do so. Tr. 88.

 While Plaintiff was against the fence, he was handcuffed behind his back, and Patterson

then turned him around from the fence and started pushing Plaintiff towards the car.[4] Tr. 18.

During that time Plaintiff continued to yell "call 9-1-1" and "call the police"; he continued to

fear that he was being abducted, was not going willingly into the car, and did not stop screaming

until he was inside of the car. Tr. 18, 83, 89-92. According to Plaintiff, when they reached the

car, Patterson put his hand against the side of Plaintiff's head and pushed it into the metal frame

of the car door, prompting Plaintiff to say, "why did you do that?"; Patterson did not respond.

Tr. 18-19.

 Plaintiff testified that the individual he referred to as the driver of the car—Hutchins—

did not do anything as Patterson twisted Plaintiff's arm behind his back, pushed him into the

chain link fence, and pushed his head into the car door frame, even though Hutchins's view

during the encounter was not obstructed, and Hutchins was standing at most three to five yards

away. Tr. 29-31; *see also* Tr. 300.

 Plaintiff testified that he was placed in the back seat of the car, behind the front passenger

seat. Tr. 22. Patterson sat in the front passenger seat and Hutchins sat in the driver's seat. Tr.

22-24. While Plaintiff sat in the back, Hutchins and Patterson had an "exchange"—they passed a

---

 [4] Plaintiff testified that he did not actually realize that he had been handcuffed until he was in the back of the police vehicle. Tr. 87, 95-96.

folder between them, and one of them took out a photograph.[5]  Tr. 24.  Plaintiff heard Patterson

say that they were "executing a New York State parole warrant," which prompted Plaintiff to

reply that they had "the wrong guy" and that he "used to do this for a living."  Tr. 24.  Plaintiff

told Patterson and Hutchins "this is what I did for a living for 28 years, I'm not on parole, I don't

have a parole warrant outstanding for me."  Tr. 25.  Patterson asked to see Plaintiff's

identification, but Plaintiff told him that he could not get his identification—his New York State

Driver's license and a pistol carry permit issued by Westchester County—because he could not

move his hands; Plaintiff also testified that it was at this point that he told officers that the

handcuffs were too tight and that they were hurting him.  Tr. 24, 25, 26, 96.  Patterson got out of

the car, retrieved Plaintiff's wallet, and examined the identification documents; Patterson then

asked the driver for a handcuff key, got out of the car, came to the back seat, took Plaintiff out of

the back seat, and unlocked the handcuffs.  Tr. 26-27.  Plaintiff testified that the handcuffs were

removed "within a couple of seconds of that conversation."  Tr. 96-97.  In total, Plaintiff

estimated that he was in the back of the car, in handcuffs, for approximately two to three

minutes.  Tr. 97-98.

At some point after the handcuffs were removed, Plaintiff told Patterson, "you shouldn't

treat people like that."  Tr. 27.  Hutchins asked Plaintiff if he wanted a ride home, and Plaintiff

declined the offer.  *Id.*  As Plaintiff proceeded to his original destination, the market, he turned

around and memorized the car's license plate.  *Id.*

Once he returned home, Plaintiff asked his wife to join him while he made a phone call to

his son so that he only had to tell the story once.  Tr. 36.  Plaintiff reported feeling "rattled,"

---

[5] Around this time Plaintiff saw a photograph of Uzillia, the man who Patterson and
Hutchins had been looking for to arrest; Plaintiff conceded at that time that the photograph of
Uzillia did look like him.  Tr. 99-100.

"frightened," and "traumatized." *Id.* Plaintiff's wife, Patricia Ketcham, testified that her

husband was shaking, and was a "different kind of upset than I had ever seen before." Tr. 137.

Plaintiff testified that he made three phone calls that evening: one to his son, one to the New

Rochelle Police Department, and one to the Mount Vernon Police Department. Tr. 36. He spoke

to a dispatcher at the New Rochelle Police Department and gave an account of what happened,

telling the dispatcher that he did not know if the encounter was an attempted abduction or

attempted robbery. Tr. 37. Plaintiff recalled that he then had a conversation with a New

Rochelle Police detective, and he told the detective that two individuals who claimed they were

executing a New York State parole warrant accosted him, handcuffed him, and hit his head in the

course of forcing him into the back of a car. Tr. 38. Plaintiff testified that he then called the

Mount Vernon Police Department and spoke with a supervisor. Tr. 39-40.

　　　Plaintiff's son, an attorney, advised Plaintiff and his wife to take photographs of

Plaintiff's wrists; Plaintiff also took pictures of his knees. Tr. 40-41, *see* Pl.'s Ex. 1. Plaintiff

described his injuries as broken skin on both wrists, bruising, and scratched knees. Tr. 41.

Plaintiff noted that there was no abrasion or bruise on his head from where it hit the car, and it

"did not really hurt." *Id.* Similarly, Patricia Ketcham noted that with respect to his head,

"[t]here was really nothing to see." Tr. 138. Plaintiff believed the injuries on his wrist were

from the handcuffs, and testified that bruising on his wrists remained painful for several days.

Tr. 41-43. He did not feel any pain from injuries to his knees. Tr. 52. Plaintiff did not take any

pain medication for his knee and did not seek any medical attention for his head. Tr. 111-12.

Plaintiff testified that as a result of the incident he was "thoroughly traumatized," and that when

something triggered memories of the incident the trauma and fear would resurface. Tr. 52-54.

Plaintiff noted that since he relocated to Boston in September 2019, he has been back to New

Rochelle several times, but he deliberately avoids the area where the incident took place.  Tr. 54, 57.

### B.   Defendants' Testimony

According to Patterson, when he exited the car believing that Plaintiff was Uzillia, he was wearing civilian clothes but had his silver police shield "outside [his] outer-most garment," suspended from his neck on a string.  Tr. 163-64.  Patterson testified that he approached Plaintiff "pretty briskly" and he said "Mount Vernon Police Warrant Squad; may I see your identification, please?," Tr. 164, 166, and also said "something to [the] effect" of "[y]ou resemble a party that we're looking at," Tr. 200.  Patterson extended his right hand with his palm facing downwards, as an indication to Plaintiff to stop.  *Id.*  At the time Patterson exited the car, Plaintiff was approximately ten feet away, further north on the street, but when Patterson first identified himself to Plaintiff as being a member of the Warrant Squad, they were only two feet apart.  Tr. 164-65, 167.

Patterson testified that when he asked for Plaintiff's identification, Plaintiff replied, "for what, for what," in a "defiant" type of tone.  Tr. 168.  According to Patterson, after he asked Plaintiff for his identification, Plaintiff bent his knees and assumed what Patterson described as a "fighting stance," though he added that Plaintiff did not have his hands up with his fists balled. Tr. 176.  Patterson testified that Plaintiff then "basically took his chest area and shoulder and pushed past me, or attempted to push past me."  Tr. 168.  Patterson described the act as a "body check," in which Plaintiff "used his upper body . . . and his right shoulder to push against my shoulder chest area to move me out of the way."  Tr. 203.  At this point, according to Patterson,

he put Plaintiff in an "arm bar"[6] with the objective of attempting to put him in handcuffs.  Tr.

170.  In the course of this action, Patterson moved Plaintiff onto the fence because, according to

Patterson, Plaintiff was "trying to escape the arm bar . . . [b]y trying to move his right arm and

flailing his left arm and twisting his body."  Tr. 171.  While Plaintiff was pressed against the

fence, "he tried to push back and twist his body left and right to evade being put . . . in handcuffs

and possibly escape."  Tr. 172.  During this time Plaintiff was screaming in a "very loud" voice

that he was "being abducted by fake cops."  *Id.*  According to Patterson, after a brief struggle

with Plaintiff "flailing his arms and twisting his body and trying to . . . wiggle out of my grasp,"

Hutchins was able to secure Plaintiff into handcuffs.  Tr. 173.  According to Patterson, it took

him and Hutchins "a lot" of force to get Plaintiff into handcuffs because they had to "use and

match force to overcome him to get him in cuffs because of his resisting."  Tr. 177.  Once

Plaintiff was handcuffed, however, Patterson testified that "the force basically stopped."  *Id.*

That said, while he was handcuffed, Plaintiff continued to scream.  *Id.*  Patterson testified that

from the time he exited the car to the time that Plaintiff was in handcuffs, approximately five

minutes elapsed.  *Id.*

Hutchins testified that he exited the car a few seconds after Patterson, after he parked the

car.  Tr. 287.  The first thing that Hutchins heard Patterson say to Plaintiff was to ask Plaintiff

what his name was.  *Id.*  Hutchins recalled that Plaintiff replied "who wants to know," and that

Patterson responded that Plaintiff "had an active warrant by the City of Mount Vernon and that

he was under arrest."  Tr. 288.  According to Hutchins, Plaintiff "bladed himself" by taking a

---

[6] Patterson described an arm bar as "a police technique taught to basically lock your—
whichever arm you're going to grab, lock it out to be able to gain compliance of a suspect to put
him in handcuffs."  Tr. 170.  Plaintiff was also familiar with the "arm bar" technique from his
law enforcement training, Tr. 63, and indicated during his testimony that Patterson had put him
in an "arm bar," Tr. 83, 84.

step back, placing his shoulder in contact with the fence; Hutchins interpreted this posture as Plaintiff assuming a "fighting stance." Tr. 288, 289. Hutchins testified that either he or Patterson advised Plaintiff to put his hands behind his back and then "immediately" went to grab for Plaintiff's wrists. Tr. 288. Both he and Patterson got hold of Plaintiff's wrists and were trying to place him in handcuffs. Tr. 288-89. Hutchins estimated that it took "about two or three minutes" between the time that he first grabbed Plaintiff by the hand to the time the officers had him in handcuffs because Plaintiff was screaming very loudly that the officers were attempting to kidnap him, and swaying his torso back and forth to prevent the officers from getting a good grasp on his wrists. Tr. 289-90. Hutchins recalled that he placed cuffs on Plaintiff's left wrist and that Plaintiff was handcuffed behind his back. Tr. 290-91. Plaintiff continued to "scream at the top of his lungs" that he was being kidnapped, and asked bystanders to call the police. Tr. 290.

Patterson testified that once Plaintiff was handcuffed, he grabbed the chain that connected the cuffs and guided Plaintiff to the car. Tr. 177. According to Patterson, when the car door was opened, Plaintiff stuck out one of his legs in a locked straight position against the frame of the car door to prevent the officers from putting him in the car. Tr. 177-78. Patterson repeatedly told Plaintiff to "stop resisting," and recalled that one of the officers managed to move Plaintiff's leg from car. Tr. 179. Patterson testified that he put his hand on the top of Plaintiff's head to guide him into the car so that his head would not hit the door, but "as a result of [Plaintiff] still not being compliant," Plaintiff's head hit the top part of the open car door. *Id.* Patterson testified that when he observed Plaintiff's head hit the door, neither he nor Plaintiff said anything. *Id.* As the officers were trying to put Plaintiff in the back seat, he continued to scream loudly that he was being abducted. Tr. 180.

Hutchins also testified that once he and Patterson brought Plaintiff to the car, Plaintiff extended his leg and placed it on the bottom of the hinge of the passenger door to prevent the officers from putting him in the car.  Tr. 290-91, 293.  According to Hutchins, he then asked Plaintiff several times to have a seat in the vehicle and placed his hand on Plaintiff's left shoulder, and eventually Plaintiff moved into the car.  Tr. 291, 293.  Hutchins did not observe Patterson put his hand on Plaintiff's head, and did not observe Plaintiff strike his head on the car as he got inside.  Tr. 293, 305.  Hutchins testified that when Plaintiff entered the car, "the screaming and yelling stopped."  Tr. 294.

Patterson also testified that when the officers managed to get Plaintiff into the car, "his demeanor changed immediately."  Tr. 180.  According to Patterson, Plaintiff told them "I'm on your side, I'm law enforcement, ex-law enforcement, I have my I.D. in my right pants pocket." *Id.*  Patterson asked Plaintiff if he could take out his identification, and when Plaintiff said he could, Patterson exited the passenger side of the car, opened the rear door, and removed Plaintiff's wallet from his pocket.  Tr. 180-81.  Upon seeing Plaintiff's identification, Patterson asked Hutchins for a handcuff key and released Plaintiff from the handcuffs.  Patterson testified that he did not hear Plaintiff complain about the handcuffs and observed no injuries to Plaintiff's wrists or his head.  Tr. 181-82.  He recalled that less than a minute elapsed between the time that Plaintiff identified himself as a former law enforcement officer to the time that Plaintiff's handcuffs were removed.  Tr. 183.  Patterson testified that his last interaction with Plaintiff was releasing Plaintiff from the handcuffs.  Tr. 185.  Patterson also testified that at some point while Plaintiff was handcuffed in the back of the car, Plaintiff observed Patterson and Hutchins passing the picture of Uzillia between them, and when Patterson asked, "doesn't that look like you?," Plaintiff agreed that it did.  Tr. 182.

Hutchins recalled that once Plaintiff was in the car, he got into the driver's seat, Patterson got into the passenger's seat, and before Hutchins began to drive away, he turned around to Plaintiff and said, "we been looking for you for a long time, Mr. Uzillia." Tr. 293-94. Hutchins testified that Plaintiff responded, "that's not my name. My name's Ronald Ketcham." Tr. 294. According to Hutchins, Plaintiff told them he had identification in his rear pocket, and Patterson got out of the vehicle to retrieve the wallet from Plaintiff's pocket. *Id.* Patterson then confirmed that Plaintiff's real name was Ronald Ketcham. *Id.* Hutchins also testified that he did not hear Plaintiff make any statements or complaints about the manner in which he was handcuffed. Tr. 294-95. He estimated that Plaintiff was in the car for approximately two minutes before he was released. Tr. 295. Hutchins testified that the officers "apologized for the interaction between us," and Plaintiff said he understood. *Id.* Hutchins also testified that they asked Plaintiff whether he needed a ride home. *Id.* Hutchins testified that he did not observe any injury to any part of Plaintiff's body, and that Plaintiff also did not complain about any injuries once he was out of the handcuffs. Tr. 296.

With respect to "double locking" of handcuffs, Patterson explained that handcuffs have a "double lock" mechanism which, when used, ensures that if a suspect moves around while handcuffed, the handcuffs will not continue to tighten around their wrists. Tr. 183-84. If the "double lock" mechanism is not activated, handcuffs can become tighter around an individual's wrists "if [he or she] move[s] around a lot." Tr. 184. Patterson testified that he was trained to use double locking, but was not able to double lock the handcuffs during this incident because Plaintiff was "actively resisting," and that a suspect needed to be compliant in order for an officer to double lock handcuffs. Tr. 184-85. While there was a short period of time after Plaintiff had been handcuffed when, according to Patterson, Plaintiff stopped resisting, this was

**SPA-12**

not enough time to "double lock" the cuffs, "because as soon as he stopped, he basically started right back up again when [Patterson] started to guide him towards the car." Tr. 268. Hutchins testified that he had the key to the handcuffs, but did not double lock Plaintiff's handcuffs—even though that was normally his practice when he placed suspects in the back of patrol cars—because Plaintiff became "resistant" and placed his foot in the doorjamb. Tr. 296-97.

Patterson testified that when he and Hutchins returned to the police station, they reported the interaction with Plaintiff to their supervisor, Sergeant Krista Mann. Tr. 220-21; *see* ECF No. 78 at 5. Sergeant Mann instructed them to write down what happened on an incident report. Tr. 229. Hutchins prepared the report, and Patterson reviewed it. Tr. 222-24; *see* Pl.'s Ex. 9; Tr. 319-25.

### III.   Credibility Findings and Assessment of Key Disputed Issues

"As the finder of fact, the Court is entitled to make credibility findings about the witnesses and testimony and to draw reasonable inferences from the evidence presented." *United States v. Asare*, 476 F. Supp. 3d 30, 26 (S.D.N.Y. 2020). Here, the Court cannot conclude that the testimony of any of the three witnesses directly involved in the March 28, 2017 encounter fully, credibly, and accurately depicts the interaction between Plaintiff, Patterson, and Hutchins on that day. Certain aspects of each story appear to be genuine, while other aspects of each story appear to be overstated in different ways. Accordingly, the Court finds aspects of each witness's account credible, and makes the following findings of fact based on all of the testimony and documents received in evidence.

As an initial matter, the Court does not credit Patterson's testimony regarding the manner in which he introduced himself to Plaintiff. Patterson testified that as he approached Plaintiff, he identified himself as a member of the Mount Vernon Police Warrant Squad, asked Plaintiff for

identification, and informed him that he "look[ed] like someone we're looking for who has a

warrant." Tr. 164, 168. But if Patterson had clearly identified himself in this way, it is highly

unlikely that the March 27, 2018 encounter would have proceeded the way it did. While Plaintiff

acknowledged that he had some inkling during the encounter that Patterson was a police

officer—he observed Patterson's badge as he approached, Tr. 75; he recognized the "arm bar" as

a law enforcement technique, Tr. 83-84; and he saw Patterson's properly holstered firearm, Tr.

86—there would have been no need for Plaintiff to attempt to deduce Patterson's identity had

Patterson clearly identified himself at the outset. Moreover, Plaintiff had no reason to be

concerned about an interaction with law enforcement on March 28, 2017—contrary to Uzillia,

the man Plaintiff resembled, Plaintiff had no outstanding warrants for his arrest, and indeed had a

long service record as a law enforcement officer himself. Therefore, Plaintiff's reaction to

Patterson and Hutchins almost immediately after their encounter began—screaming at the top of

his lungs, yelling for people on the street to call 9-1-1, and an ongoing sense that he was being

abducted and/or robbed—only makes sense if he did not understand that Patterson and Hutchins

were police officers. On balance, the testimony of both Plaintiff and Hutchins—who reported

that Patterson's first words to Plaintiff were to ask Plaintiff who he was, rather than identifying

himself as a Mount Vernon police officer, Tr. 13, 287—are the more credible recitations of how

the March 28, 2017 encounter began.

The Court also does not find at all credible Patterson's testimony that Plaintiff initiated

contact during the encounter by attempting to push past him and "body checking" him. *See* Tr.

168-69, 203. This testimony is inconsistent with the recollections of Plaintiff—who testified that

he remained "frozen" as Patterson came upon him, Tr. 77—and Hutchins, who observed that

Plaintiff "bladed himself" by taking a step backwards towards the fence as Patterson approached,

Tr. 288-89. But Plaintiff's testimony that he was entirely "frozen" as Patterson approached him is also difficult to reconcile with Plaintiff's obvious concern for his own welfare as Patterson closed the gap between them in a matter of seconds. Indeed, Plaintiff may well have perceived himself to be remaining still even while he was making small movements that would have been consistent with his state of mind and also the observations of both Patterson and Hutchins. Patterson's own testimony about Plaintiff's immediate reaction—that he bent his knees as Patterson came closer, Tr. 176—is considerably more credible than his testimony about "body checking." It is generally consistent with Hutchins's testimony, and also makes sense in the context of Plaintiff's testimony about the fear he was experiencing as he was approached quickly on the street by a man he did not recognize. Both Patterson and Hutchins testified that they interpreted Plaintiff's initial physical reaction—whether bending his knees or taking one step backwards—as the assumption of a fighting stance, even though Plaintiff had not raised his arms or balled his hands into fists. These similar (though not identical) elements of testimony from the officers are credible, and it is understandable that the officers understood Plaintiff to be positioning himself in a way that made it appear as though he was prepared to defend himself rather than voluntarily comply with police requests. Plaintiff's responses to Patterson's initial questions and statements—"who are you," and "I'm taking you in"—were challenging rather than compliant (asking Patterson "who are you," and responding "for what"), and Patterson and Hutchins reasonably believed they were interacting with Uzillia, a man for whom they had an active arrest warrant and who they believed resided nearby. Taking all of this evidence together, the Court finds that the lack of clarity by Patterson at the outset, combined with Plaintiff's significant resemblance to Uzillia, Plaintiff's defensive responses to Patterson's remarks, and

Plaintiff's minor adjustments of his body in a manner that suggested a defensive posture led to the unfortunate series of events that followed.

With respect to the portion of the encounter when Plaintiff was handcuffed and placed against the fence, the Court credits Hutchins's testimony that he was directly involved in the process of placing handcuffs on Plaintiff, rather than Plaintiff's testimony that Hutchins was standing by as an observer. The Court also credits the generally consistent testimony of both Patterson and Hutchins that Plaintiff was "twisting his body" and/or "swaying his torso" as they were attempting to apply handcuffs. Tr. 171, 289. Plaintiff testified that he was screaming and yelling from the moment the officers initiated physical contact with him to the moment he was placed into the police vehicle, and he was genuinely terrified that he was being abducted on the street. While Plaintiff recalled being "immobilized" throughout the encounter, he also acknowledged that he was moving his head constantly from side to side even after he was against the fence. Tr. 17, 84-86, 89, 92. The officers' similar (though not identical) testimony about Plaintiff's movements during this portion of the encounter is credible, and Plaintiff's acknowledgement that he was moving some parts of his body and was so agitated that he was yelling and screaming to such a degree that his voice became hoarse, leads the Court to determine that Plaintiff was, in fact, moving his torso to a substantial degree as Patterson and Hutchins attempted to handcuff him. Part of the reason the Court resolves this discrepancy in this manner is that it is reasonable to infer that the officers' recollections are consistent with the physical reactions of an individual who was as concerned for his safety and well-being as Plaintiff evidently was at that time.

As for the moments when Plaintiff was moved from being against the fence to being in the police vehicle, the Court credits the testimony of both officers, who explained that Plaintiff

stuck out one of his legs in a locked position against the bottom of the car door to prevent the officers from putting him inside. Tr. 177-79, 290-91, 293. Plaintiff had "no recollection" of using his foot to stop himself from going into the car. Tr. 90. But Plaintiff was still screaming to passersby to call the police at this time, and "absolutely" did not want to enter the car, because he still thought that he was in the process of being abducted; it is therefore reasonable to conclude that Plaintiff, in his general state of distress, as he was being guided towards the car, pushed his leg against the car, perhaps even without realizing it. *See* Tr. 90-92.

Additionally, the Court finds that Patterson placed his hand on Plaintiff's head and that Plaintiff's head did, in fact, make contact with the metal frame of the car, as both Plaintiff and Patterson testified. But in the context of the chaotic scene—with Plaintiff still screaming and yelling, not wanting to get into the car, and actively trying to prevent himself from being placed in the car—the Court cannot conclude that Patterson deliberately pushed Plaintiff's head into the door. Rather, the Court finds that Plaintiff's head was inadvertently caused to come into contact with the door as a result of the difficulties that Patterson and Hutchins were having getting Plaintiff into the vehicle. This portion of the encounter was yet another unfortunate byproduct of the misunderstanding that began with Patterson's initial approach, and continued with Plaintiff's significant reaction based on his fear and apprehension about what was transpiring.

Finally, while there are some inconsistencies in the testimony about exactly what happened and what was said once Plaintiff was inside the police vehicle, the general contours of the testimony are essentially the same. The officers spoke to each other, Plaintiff developed an understanding that they were (or were claiming to be) police officers attempting to execute a warrant, and Plaintiff told the officers that he was not the person for whom the officers had a warrant. In a short sequence of events that lasted no more than two to three minutes, Plaintiff

**SPA-17**

told the officers that he had identification, Patterson removed the identification from Plaintiff's pocket, and when it became clear that Plaintiff was not Uzillia, Plaintiff was released from handcuffs and let go.  Even though neither Patterson nor Hutchins recalls hearing Plaintiff make a complaint about his handcuffs being too tight, the Court credits Plaintiff's testimony that he did make such a complaint once he was in the car.  Plaintiff admitted, however, that he did not even realize that the handcuffs were on his wrists until he was inside of the car, and that the handcuffs were removed very shortly after he complained about them.

## CONCLUSIONS OF LAW

In order to prevail on his claims, Plaintiff "bears the burden of proving the elements of his claim by a preponderance of the evidence." *Wilson v. Calderon*, 367 F. Supp. 3d 192, 195 (S.D.N.Y. 2019); *see Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993); *Ruggiero v. Krzeminski*, 928 F.2d 558, 562 (2d Cir. 1991).  "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9 (1997) (quotation marks omitted).

### I.      Excessive Force Claim

#### A.      Legal Standards

"To prevail on a claim brought under Section 1983, a plaintiff must prove, by preponderance of the evidence, '(1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law.'" *Toliver v. New York City Dep't of Corr.*, 202 F. Supp. 3d 328, 334 (S.D.N.Y. 2016) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015)).  The parties have stipulated that Patterson and Hutchins were acting under the color state

law at the time of the incident, and therefore that Plaintiff has established this element of his

Section 1983 claim.  Tr. 367-68; ECF No. 78 at 4.

When an "excessive force claim arises in the context of an arrest or investigatory stop of

a free citizen, it is most properly characterized as one invoking the protections of the Fourth

Amendment."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force

used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful

balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the countervailing governmental interests at stake."  *Id.* at 396 (quotation marks

omitted).  Proper application of the reasonableness test "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight."  *Id.*  These three considerations

are known as the "*Graham* factors."  *See Brown v. City of New York*, 798 F.3d 94, 100, 102 (2d

Cir. 2015).

"[R]easonableness of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight"—indeed, "[n]ot

every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,

violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (cleaned up).  Ultimately, "[t]he

calculus of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments . . . about the amount of force that is necessary in a

particular situation."  *Id.* at 396-97.

This reasonableness inquiry is an "objective" one: "the question is whether the officers'

actions are objectively reasonable in light of the facts and circumstances confronting them,

without regard to their underlying intent or motivation." *Id.* at 397. "*Graham* thus stands for the proposition that a government officer may not intrude on a person's Fourth Amendment rights by employing a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019).

### B.   Application of the *Graham* Factors

Neither of the first two *Graham* factors suggested in advance the need for any type of force to apprehend the individual who Patterson believed to be Uzillia on March 28, 2017. The warrant for Uzillia's arrest was for the misdemeanor crime of forcible touching, Tr. 158, 244, 282, which does not on its face suggest the need for a forceful response, *see Cugini*, 941 F.3d at 613 (finding that the misdemeanor offense of stalking and harassment at issue was "a relatively minor one"). Patterson and Hutchins had no reason to anticipate that Uzillia would pose an immediate threat—Patterson testified that there was no information to suggest that Uzillia would be dangerous or armed, that he had a history of violence, or that he had any history of charges or convictions for resisting arrest or assaulting officers. Tr. 244-45. Moreover, as to the actual interaction with Plaintiff, Patterson testified that he did not feel he was in danger at any point, and neither Patterson nor Hutchins called for backup at any time during the incident. Tr. 208, 245.

The third *Graham* factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—is what gives rise to the officers' decision to apply a degree of force in their interaction with Plaintiff. Even though, contrary to Patterson's testimony, Plaintiff did not initiate physical contact with the officers, his adoption of a defensive physical posture and his challenging responses to Patterson's questions and statements made it objectively reasonable, in light of all of the circumstances presented at that moment, for Patterson and Hutchins to initiate

the process of attempting to physically restrain Plaintiff and take him into custody. At that point, Patterson and Hutchins were seeking to execute an arrest warrant for Uzillia, were still reasonably under the impression that Plaintiff *was* Uzillia, and were therefore taking steps that were reasonably necessary to effectuate the arrest. Then Plaintiff began to physically resist to a greater degree, moving and twisting his torso and moving his head, all while screaming at the top of his lungs, such that it took two officers a period of minutes to ultimately place Plaintiff into handcuffs. There is no question that some degree of force was used at this stage of the encounter, but in light of the Court's factual findings regarding Plaintiff's movement and conduct at this time, the Court concludes that the degree of force used by the officers to place Plaintiff in handcuffs in order to place him under arrest—including the use of the arm bar technique, the application of the handcuffs, and placing Plaintiff against the chain link fence— was objectively reasonable in light of the circumstances presented.

It is clear that that pushing an arrestee's head into a police car door can constitute excessive force. *See Ketcham*, 992 F.3d at 151; *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004). But as the Court already has concluded as a factual matter that the portion of the encounter in which Plaintiff's head came into contact with the frame of the car was not a deliberate action by Patterson to apply force but rather an unfortunate consequence of the difficulty associated with getting Plaintiff into the police vehicle, the head/door contact also cannot be considered excessive force in light of the totality of the circumstances at that time.

### C.   Tightness of the Handcuffs

To determine whether a plaintiff has sufficiently alleged a claim for excessive force in the process of handcuffing, courts consider three evidentiary factors: whether "(1) the [arrestee's] handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the

handcuffs were too tight; and (3) the degree of injury to the [arrestee's] wrists." *Cugini*, 941

F.3d at 612-13 (quotation marks omitted). "A court's reasonableness analysis is not limited to a

factual checklist," however, as courts must always balance the nature and quality of the intrusion

and the countervailing government interests at stake. *Id.* at 613 (citing *Graham*, 490 U.S. at

396). "The question is more broadly whether an officer reasonably should have known during

handcuffing that his use of force was excessive." *Id.* In this Circuit, "where an officer's use of

force in handcuffing is plainly unreasonable under the circumstances *or* where a plaintiff

manifests clear signs of [his] distress—verbally or otherwise—a fact finder may decide that the

officer reasonably should have known that his use of force was excessive for purposes of

establishing a Fourth Amendment violation." *Id.*

Here, Plaintiff testified that his handcuffs were too tight during the encounter, and that

this caused broken skin and bruising on his wrists. Tr. 24, 40-41; *see* Pl.'s Ex. 1. Plaintiff only

complained once to Patterson and Hutchins about the handcuffs; this took place in the car,

because prior to being in the car, Plaintiff did not realize that he had been handcuffed. Tr. 95.

Patterson unlocked the handcuffs shortly after. Tr. 26-27. As to the first two evidentiary factors,

even accepting that the handcuffs may, in fact, have become unreasonably tight at some point

during the encounter, Patterson and Hutchins did not ignore Plaintiff's complaint—the handcuffs

were removed shortly after Plaintiff asked Patterson to remove his identification from his rear

pocket, which is also when Plaintiff testified that he complained about the handcuffs. Tr. 26-27,

97-98, 180-81, 295-96. Plaintiff estimated that he was in the back of the car in handcuffs for

approximately two to three minutes, and also testified that the handcuffs were removed "within

seconds" of him making his complaint.

And while Plaintiff was able to demonstrate some injury to his wrists, he has not proven by a preponderance of the evidence that he sustained any serious physical injuries from the application of the handcuffs. Plaintiff provided photographs that showed broken skin and bruising on his wrists, and noted that the bruising on his wrists remained painful for several days. Tr. 41-43. Plaintiff did not seek medical attention for the injuries to his wrists, although he asserted that the incident "aggravated" his preexisting wrist conditions. Tr. 109-11. In sum, Plaintiff was restrained in handcuffs for just a few minutes, the handcuffs were removed promptly after he complained to officers about them, and although he suffered injuries, they were relatively minor and short-lived. "There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008); *see also Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (collecting cases where bruising, swelling, and cuts were found insufficient to sustain excessive force handcuffing claims).

Plaintiff also asserts, however, that the officers should have known that the force they used in handcuffing Plaintiff was excessive because they failed to "double lock" the handcuffs. The Court disagrees. While it was evidently the policy of the Mount Vernon Police Department to "always double lock cuffs," the officers' failure to do so here does not rise to the level of excessive force. *See* Pl.'s Ex. 14; Tr. 193-94. As both officers testified, they were told in their training that if a subject was non-compliant, they should focus on getting the handcuffs on as quickly as possible, and did not need to double lock them. Tr. 268, 296-97. While there may have been a fleeting moment after the handcuffs were applied to Plaintiff where the need for force from Patterson and Hutchins abated, the totality of the evidence makes clear that this

moment was short lived.  Plaintiff continued to yell and scream at a loud volume as the officers

attempted to move him to the vehicle, and further attempted to stop himself from being placed in

the vehicle by placing his leg on the doorframe.  This chaotic situation was not stable enough to

enable Patterson or Hutchins to safely and reasonably double lock the cuffs in the manner

demonstrated during the trial.  Moreover, the failure to double lock handcuffs is not *per se*

excessive force.  *See Getz v. Swoap*, 833 F.3d 646, 655 (6th Cir. 2016) ("[W]e have never held

that an officer's failure to check for tightness or double lock handcuffs at the moment of arrest is,

*per se*, excessive force.").  Additionally, as discussed above, the officers responded promptly to

Plaintiff's complaint that the handcuffs were hurting him, which distinguishes this case from

others in this Circuit where officers did not double lock handcuffs and subsequently ignored

pleas from arrestees that the handcuffs were hurting them.  *See Sharnick v. D'Archangelo*, 935 F.

Supp. 2d 436, 447 (D. Conn. 2013) (ruling on summary judgment that a rational jury could find

that officer used excessive force when he failed to double lock handcuffs and did not stop police

cruiser when arrestee "cried out" in pain).  Keeping in mind that the test of reasonableness under

the Fourth Amendment "requires careful attention to the facts and circumstances of each

particular case," the Court cannot conclude that the officers' failure to double lock Plaintiff's

handcuffs in this case rose to the level of excessive force, or that the circumstances of the

application of handcuffs though the course of the encounter constituted excessive force.  *See*

*Graham*, 490 U.S. at 396.

### D.  Failure to Intervene

"A police officer is under a duty to intercede and prevent fellow officers from subjecting

a citizen to excessive force, and may be held liable for his failure to do so if he observes the use

of force and has sufficient time to act to prevent it."  *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d

Cir. 2016). "Liability attaches on the theory that the officer, by failing to intervene, becomes a tacit collaborator in the illegality." *Id.* (quotation marks omitted). An officer may only be held liable for failing to intervene when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). An officer cannot be liable for failing to intervene to prevent a constitutional violation when the Court has determined that there was no constitutional violation in the first place. *Kayo v. Mertz*, 531 F. Supp. 3d 774, 799 (S.D.N.Y. 2021) (citing *Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) (summary order)).

Because the Court has concluded that there was no use of excessive force during the March 28, 2017 encounter with Plaintiff, Hutchins cannot be liable on a theory of failing to intervene, as there was no constitutional right being violated during the incident.

## II.   Assault and Battery Claims

"The elements of New York assault and battery and Section 1983 excessive force claims are 'substantially identical." *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) (quotation marks omitted). Civil assault under New York law "'is an intentional placing of another person in fear of imminent harmful or offensive contact,'" whereas civil battery "'is an intentional wrongful physical contact with another person without consent.'" *Id.* (quoting *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)). In order to prove an assault or battery claim in the law enforcement context, a plaintiff must also demonstrate that the defendant officer's conduct "'was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties.'" *Id.* (quoting *Nimely*

*v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005)).  New York Penal Law § 35.30

establishes a justification defense for an officer's use of force in the course of several

enumerated public duties." *Id.*  Of particular relevance here, the statute provides that "[a] police

officer . . . may use physical force when and to the extent he or she reasonably believes such to

be necessary to effect [an] arrest . . . ."  N.Y. Penal Law § 35.30(1).  This statute requires a finder

of fact "to conduct precisely the same analysis as does the reasonableness standard" under the

Fourth Amendment.  *Heath v. Henning*, 854 F.2d 6, 9 (2d Cir. 1988); *accord Taylor v. Quayyum*,

No. 16-cv-1143 (GHW), 2021 WL 6065743, at *8 (S.D.N.Y. Dec. 21, 2021).

 Because the Court has concluded that Patterson's use of force was objectively reasonable

during the March 28, 2017 encounter with Plaintiff, Plaintiff also has failed to prove his state law

claims for assault and battery by a preponderance of the evidence.

## CONCLUSION

 For the foregoing reasons, the Court finds that Plaintiff has failed to prove, by a

preponderance of the evidence, that Defendants are liable on any of the claims asserted by

Plaintiff in this action

 The Clerk of Court is respectfully directed to enter judgment in favor of Defendants on

all of Plaintiff's remaining claims, and to close this case.

Dated: March 31, 2023
 White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
RONALD KETCHAM,

                Plaintiff,

      -against-                                17 **CIVIL** 7140 (AEK)

                                                    **<u>JUDGMENT</u>**

THE CITY OF MOUNT VERNON, ALLEN
PATTERSON, and MICHAEL HUTCHINS,

                Defendants.
------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated March 31, 2023, the Court finds that Plaintiff has

failed to prove, by a preponderance of the evidence, that Defendants are liable on any of the

claims asserted by Plaintiff in this action. Judgment is entered in favor of Defendants on all of

Plaintiff's remaining claims; accordingly, the case is closed.

**Dated:**  New York, New York

       March 31, 2023

                                     **RUBY J. KRAJICK**

                                 _____
                                     **Clerk of Court**

                **BY:**        K. Mango

                                    _____
                                     **Deputy Clerk**